UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---------------------------------------------------X

REGGIE YOUNG,            :      02 CV 1087 (DNH) (DRH)

             Petitioner,      :

        -against-         :

CHARLES GREINER, Superintendent,       :
Green Haven Correctional Facility,

            Respondent.      :

---------------------------------------------------X

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
MAR 1 7 2006
AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

---

### MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S AMENDED HABEAS CORPUS PETITION

---

REGGIE YOUNG
97A4377
P.O. Box 4000
Stormville, New York
12582-0010

March 7, 2006

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................ 1

QUESTIONS PRESENTED .......................................... 1

STATEMENT OF FACTS ........................................... 2

    A.   Introduction ......................................... 2

    B.   The Pre-Trial Hearing ............................. 5

    C.   The Trial ........................................ 5

          a.   Mitchell's misleading testimony regarding the argument preceding the murder .......... 6

          b.   Croman's claim that the only consideration he received was a transfer of his probation   11

          c.   Croman's claim that he did not receive consideration on his pending burglary charge ........................................ 11

          d.   Summations ................................... 13

    D.   Verdict & Sentence ............................... 14

    E.   Young's First C.P.L. §440.10 Motion .............. 14

    F.   Young's Direct Appeal ............................ 16

    G.   Young's Second C.P.L. §440.10 Motion ............. 16

    H.   Young's Third C.P.L. §440.10 Motion .............. 19

    I.   Young's Federal Habeas Proceedings ............... 21

POINT I

    YOUNG'S FEDERAL RIGHT TO DUE PROCESS WAS VIOLATED BY (A) THE PROSECUTION'S SUBORNATION OF ITS STAR WITNESS'S PERJURED TESTIMONY DENYING THE CONSIDERATION EXTENDED TO HIM IN EXCHANGE FOR HIS TESTIMONY, (B) THE PROSECUTION'S OTHER STAR WITNESS'S PERJURED TESTIMONY SUPPRESSING THE FACT THAT HIS EMPLOYER IN THE DRUG TRADE WHOM HE DENIED WORKING FOR, HAD THE NIGHT BEFORE THE MURDER, DECLARED THAT THE VICTIM HAD TO BE MURDERED, AND (C) THE PROSECUTION'S FALSE SUMMATION CAPITALIZING ON ITS TWO STAR WITNESSES' PERJURED TESTIMONY. U.S. CONST. AMENDS. V, XIV. ................ 22

A.   Introduction ..................................... 22

B.   The Applicable Legal Standards ................... 24

C.   The Perjured Testimony & False Summation At
     Young's Trial ................................... 28

     1.   Lance Croman .............................. 28

     2.   Tyrone Mitchell ........................... 30

D.   The State Court's Reasons For Rejecting Young's
     Perjury Claims Were Fallacious .................. 33

E.   An Evidentiary Hearing Is Required On Young's
     Application .................................... 35

POINT II

     THE STATE'S REJECTION OF CLEAR EVIDENCE ESTABLISHING
     YOUNG'S   INNOCENCE   VIOLATED   YOUNG'S   RIGHT TO DUE
     PROCESS.  U.S. CONST. AMENDS. V, XIV. ................. 37

POINT III

     THE   PROSECUTION'S   HIGHLY   PREJUDICIAL   SUMMATION
     VIOLATED   YOUNG'S   RIGHT   TO DUE PROCESS.  U.S. CONST.
     AMEND. V, XIV. ........................................ 40

     1.   The state court's basis for denying Young's
          challenge to the prosecution's summation was
          fallacious .................................... 42

POINT IV

     YOUNG WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE
     OF   COUNSEL   BY   VIRTUE   OF   HIS   TRIAL ATTORNEY'S
     INEXPLICABLE   FAILURE   TO DEMAND   RELIEF IN THE FACE OF
     CROMAN'S PERJURY.  U.S. CONST. AMEND. VI. ............. 43

CONCLUSION ............................................... 45

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------X
                                    :
REGGIE YOUNG,                       :        02 CV 1087 (DNH)(DRH)
                                    :
                    Petitioner,     :
                                    :
            -against-               :
                                    :
CHARLES GREINER, Superintendent,    :
Green Haven Correctional Facility,  :
                                    :
                    Respondent.     :
                                    :
------------------------------------X


## PRELIMINARY STATEMENT

Petitioner Reggie Young submits this memorandum of law
in support of his amended petition for a writ of habeas corpus
seeking to overturn his March 7, 1997 Supreme Court, Oneida
County conviction.


## QUESTIONS PRESENTED

1.  Whether Young's right to due
process was violated by (A) the prosecution
subornation of its star witness's perjured
testimony denying the consideration he
received in exchange for his testimony,
(B) the prosecution's other star witness's
perjured testimony suppressing the fact
that his employer in the drug trade, whom
he denied working for, had the night before
the murder, declared that the victim had
to be murdered, and (C) the prosecution's
false summation capitalizing on its two
star witnesses perjured testimony?

2.  Whether the state court's refusal
consider one of the prosecution's star
witnesses's declaration against penal
interest that it was he, not Young, who

1

committed the murder violated Young's right
to due process?

3. Whether the prosecution's highly
prejudicial summation violated Young's right
to due process?

4. Whether Young was deprived of
the effective assistance of trial counsel
by virtue of his trial attorney's failure
to demand relief in the face of a star
prosecution witness's rampant perjury?

## STATEMENT OF FACTS

A. **Introduction**

On January 16, 1996 at approximately 10:30 p.m. George
Bulluck, a/k/a, "Gucci" was murdered as he sat in a car on
Whitesboro Street in Utica, New York. Gucci was shot in the
head and body. It was undisputed that star prosecution witness
Tyrone Mitchell was in that car when Gucci was murdered.

Shorty after the murder, Mitchell appeared at Rome Hospital
with a gunshot wound to his leg. By that time, Mitchell had
already lied to a friend that he had been shot when three men
tried to rob him. When police questioned Mitchell about his
gunshot wound, he repeated his lie about being shot during a
robbery. But when a police teletype came in regarding Gucci's
murder, the police became suspicious of Mitchell's claim. This
time, Mitchell changed his story. Now, he claimed that "Gucci"
had shot him with a .357 magnum, the very weapon that had been
discovered on Gucci's body.

After further questioning, Mitchell changed his story to
the one he would repeat for the jury at trial: he now admitted

2

that he was in the car when Gucci was killed but claimed that it was not he, but petitioner Reggie Young ("Young"), who committed the murder. Outside of Mitchell, the only other witness linking Young to the murder was jailhouse snitch Lance Croman, who claimed that while Young was awaiting trial in the Onieda County jail, he confessed that he had committed the murder. No physical evidence linked Young to the crime, Young made no statements to the police, and the prosecution's case was grounded squarely on these two dubious witness.

Unbeknownst to the jury, however, both witnesses committed rampant perjury which would ensured anyone's conviction:

1. Croman--with the blessing of the trial prosecutor-- gave perjured testimony at Young's trial by vehemently denying he received a deal on his burglary case. In reality, as a direct result of his testimony against Young, Croman was allowed to resolve the burglary by pleading guilty to petty larceny and was immediately released prison;

2. Croman--again, with the blessing of the trial prosecutor-- gave perjured testimony at Young's trial representing that in exchange for his testimony the prosecution was arranging to have his probation "transferred" out of state. In reality, in exchange for his testimony the prosecution freed Croman of any probation obligations other than paying his fine;

3. Croman, despite the above, falsely informed the jury that the only promise the prosecution made to him was the transfer of his probation;

4. Unbeknownst to Young, four months prior to trial Mitchell had bragged to a third party that he, not Young, was the one who killed Gucci;

5. Unbeknownst to Young, Mitchell perjured himself during his testimony at a pre-trial hearing where he adamantly denied selling drugs for the supposed leader of an organization Young was allegedly affiliated with --Randy Hutchinson. Within months following his trial

3

testimony, Mitchell admitted to FBI Agents, NYCPD
detectives and an Assistant U.S. Attorney that he
had in fact sold drugs for that individual and came
to Utica for that sole purpose; and

6.    Mitchell testified falsely regarding the motive for
the murder.  Mitchell claimed that the night before
the murder, Young and Gucci argued because the decedent
had cheated Young out of the proceeds of a robbery.
The prosecution argued this was the reason Young
killed Gucci.  In truth, however, Mitchell had personal
that his boss --Randy Hutchinson-- had dispatched
Gucci to commit a robbery, that Gucci cheated
Hutchinson out of the proceeds of that robbery, that
Hutchinson too argued with Gucci, and that following
that argument Hutchinson declared that Gucci "had
to go" tonight.

As if these transgression were not bad enough, (1) the
prosecutor gave a summation which, _inter alia_, vouched for
Croman's and Mitchell's credibility, argued Croman's "transfer
or probation" was to protect him from Young and his associates,
and that Hutchinson's presentation in the courtroom was Young's
attempt to intimidate witnesses, and (2) Young's trial attorney
inexplicably failed to impeach Croman's perjures testimony,
notwithstanding his possession of conclusive evidence to do
so.

Yet despite settled federal law holding that when the
prosecution knowingly uses perjured testimony reversal is
"virtually automatic", _Su v. Fallen_, 335 F.3d 119 (2d Cir. 2004),
the state court refused to make the prosecution account for
its repugnant misconduct.  Instead, the state court rendered
indefensible factual findings and invoked inapplicable procedural
bars, circumventing any legitimate  resolution of Young's claims.
Young now petitions for federal relief from the state court's

4

refusal to undo his blatantly unjust conviction.

B.    THE PRE-TRIAL HEARING

On February 26, 1997 Mitchell testified at pre-trial hearing in Young's case.  During his testimony, Mitchell claimed he never sold drugs for Randy Hutchinson and that Hutchinson had not brought him to Utica:

> Q.   What about Randy Hutchinson?
> Did you sell drugs for him?
>
> A.   <u>No.</u>
>
> Q.   Who were you selling drugs for?
>
> A.   Sty and Stacey.
>
> Q.   And that's why you were in Utica?
>
> A.   Yes.
>
>           * * *
>
> Q.   And what about Randy?  Did he
> bring you [to Utica to sell drugs]?
>
> A.   <u>No</u> (February 26, 1997 Pre-Trial
> Transcript at pages 5-6, annexed as Exhibit
> A)

C.    THE TRIAL

<u>Tyrone Mitchell</u> was 19 years old at the time of trial, however on January 16, 1995 he was 17 years old. He lived in the Bronx, N.Y. but stayed in Utica in drug selling "spots" set up by his drug boss, "Sty" or BedSty, who had many names. Sty brought Tyrone up from the Bronx, to make money selling drugs for him. Sty's partner was his girlfriend, Stacy. They set him up in various "spots" (100-102). He would go to New York City with Sty to buy anywhere from an ounce to a kilogram

of cocaine.

He said knew the victim as "Gucci" but said he never knew his real name was George Bulluck. He was a casual acquaintance and he only knew him from seeing him for the last month or two in Geno's bar on Steuben and James Street in Utica, New York. He said he never sold drugs for Gucci and Gucci didn't ask him to. About the only thing that Tyrone did know about Gucci was that he sold drugs. The only place he saw him was at Geno's bar and he had never stayed with Gucci or socialized with him. As to Gucci's drug business. he didn't know if any one worked with Gucci, or if Gucci worked for anyone else (107-109, 115-116, 191). Mitchell also said that he knew Young in a similar casual fashion for a month or so (109).

### Mitchell's Misleading Testimony Regarding The Argument Preceding The Murder

Mitchell testified so as to omit the fact that his boss Randy Hutchinson (1) argued with the decedent and (2) declared that he had to be murdered:

> Q.    Can you describe what you observed in the bar on January 15th while you were there in the early evening hours?
>
> A.    Gucci and Reggie arguing.
>
> Q.    And you said before that they weren't together at first.  At some point in time did they come together?
>
> A.    Yes.
>
> Q.    Now tell me what you observed and what, if anything, you heard.
>
> A.    I just saw them throwing their

6

hands at each other, arguing and Reggie
saying "Where's my shit at?" And after
a few minutes Gucci threw up his hands and
I heard him say, "Fuck this," and he left.
I couldn't hear nothing else.

     Q.   Do you know what they were arguing
about, Tyrone?

     A.   Yes.

     Q.   What?

     A.   About drugs, about a robbery they
did.

                   \* \* \*

     Q.   Tyrone, did you hear something
specific about a robbery?

     A.   Not from them.

     Q.   Okay.  You heard it on the street?

     Q.   Yes (111-113).

As discussed below, Mitchell would after admit that
Hutchinson's presence and declaration that Gucci had to be
killed.

On January 16, 1996 Mitchell arrived at about 7:00 p.m.
(115-116).  Gucci pulled up in a car out of Geno's. When
Mitchell saw him, he went outside to speak to Gucci and Young
came outside. Mitchell got into the back passenger side seat
of Gucci's car, and said Young got in the front passenger's
side seat. Gucci got in the driver's seat (121-124).  Mitchell
said they were supposed to be going to Young's girlfriend's
house to drop him off, but Tyrone did not know her name, and
Gucci did not ask (125-126; 190-191).

Mitchell said it was 10:15 p.m. when they left Geno's. Mitchell explained that he had no reason to get in the car, nobody told him to, or invite to, he "just got in" for the ride because he was bored (126). Mitchell said that they did not go directly there because there was a police car sitting somewhere on Whitesboro Street, and they turned around and went a different way, around past the place and ended up driving on Whiteboro Street back in the direction from which they had come (127-128).

According to Mitchell, Young said slow down, and Gucci started looking at one of the houses. At that point, Young pointed the gun towards Gucci's head and pulled the trigger. The gun was about 10 inches away from Gucci's head. Mitchell said the bullet hit on the right side of Gucci's head. and Gucci grabbed his head and said "Oh, shit. What the fuck[,]" at which point the second bullet hit him (128-129). Gucci twisted and turned towards the passenger's seat and threw himself through the space between the bucket seats and landed on Tyrone's lap in the back seat, grabbed Tyrone by the waist and said "Please don't let him kill me." (129-130).

Mitchell said that Gucci at that point was half in the back seat, with his top half laying on Tyrone and the bottom laying in the driver's seat. Mitchell started to struggle with Gucci trying to get Gucci off of him and received a gunshot wound in the left calf during the shooting (130-131, 203-204). After the shots were fired, Young got out of the car and ran

while Mitchell was still trying to get to Gucci off of him. Mitchell saw Young go "up in the alley" on Gates Street (136, 204-209). Mitchell got Gucci off him, and as he was starting to get out of the car, Young came back out of the driveway and ran the other way. Mitchell got out of the back passenger seat door of the car. which was somewhat obstructed because that side of the car was up against a snow bank where it crashed into when Gucci was first shot (137, 204-209).

Mitchell also ran away, along Whiteboro Street toward Schuyler Street. Mitchell ran right into "Sty", his drug boss that he was selling crack for, who just happened to be walking along Schuyler Street. Mitchell had never heard of any drug spot over on Schuyler Street and did not know why "Sty" happened to be there (138-139, 204-209). Mitchell told Sty what had just happened and Sty called his girlfriend Stacy, who Mitchell worked with selling drugs. When Stacy arrived, Mitchell lied to her, and told her that he been robbed and that the robbers shot him when he wouldn't give them anything (140-143, 204-213).

The group got in Stacy's car and drove down Schuyler Street but there were a lot of police cars near the scene there so they turned around. Tyrone said it was Stacy who decided to take him to the Rome Hospital. There, Mitchell lied to the hospital and to the police about how he had gotten shot. He made a false complaint that he had been shot by three robbers near a public pool in Rome, and an investigation into that ensued. He spoke to two policemen at the hospital and he lied

9

to them too, telling them also that he was robbed by three people and that they had shot him. Rome Police were suspicious this was a false complaint, and became more so when the teletype reports of George Bulluck's shooting death in Utica came in (249-252). Stacy and Sty did not come into the hospital with him, but Daneika Russell did. Mitchell made Daneika Russell lie to the police too (144-145).

Jailhouse snitch <u>Lance Croman</u> was incarcerated at the Onieda County Jail on burglary, second degree charges when Young was arrested in October 1996. He said he had known Young because he took Young's girlfriend, Connie Fuentes, away from him. He had trouble with Young who used to come and knock on their door to see his baby and talk to Connie (523-525).

Croman had several and burglary and larceny charges pending and a conviction for second degree burglary (528-529). On October 15, 1996 Croman wrote to the District Attorney offering admissions of other inmates for "consideration" in his charges. One of those inmates was Young (530-531, 546-552, 553-556, 560-562). Croman said that on October 14, 1996 Young was put in his block and for the first night he was there Young told him why he was there. Croman said that Young admitted to killing a partner over a Dominican drug robbery because he got greedy, and leaving him a car (534-535). Croman said the next day Young told him that everything he said was just a war story (536-537).

### Croman's Claim That The Only Consideration He
### Received Was A Transfer Of His Probation

As to the consideration Croman received on his probationary

term, ADA Romano elicited the following testimony:

> Q.   Now, what, if any, promises or
> agreements have been made with you for you
> to come and testify here today?
>
> A.   To have [my] probation transferred
> out of state (529-530).

### Croman's Claim That He Did Not Receive
### Consideration On His Pending Burglary Case

Croman also staunchly denied there was any deal on his

burglary charges:

> Q.   Have you been made any promises
> by the District Attorney's Office as to
> what promises have been made to you regarding
> [the burglary] case?
>
> A.   No, none whatsoever.
>
> Q.   But it is still pending in our
> office, is that true?
>
> A.   Yes, it is (530)(emphasis added).

                    * * *

> Q.   ...My question is, has your lawyer
> negotiate a plea bargain with Scott McNamara
> on [the burglary] case?
>
> A.   No, we have not (547)(emphasis
> added).

                    * * *

> Q.   Well, isn't it your understanding
> that you can receive a petit larceny charge
> in full satisfaction with credit for 60
> days time served?  Isn't that what you're
> hoping for?
>
> MS. RAMANO:  Your Honor, I'm going

to object to that.

THE COURT:  Well, is that your
--Overruled.  Is that your understanding?

THE WITNESS:  <u>There is no understanding.
There was no deals made on the burglary
charge whatsoever.</u>

THE COURT: Has anyone talked to you
about doing that?

THE WITNESS:  On the burglary charge
there's really no deal made
(547-548)(emphasis added).

Following this exchange, ADA Romano's re-direct examination

returned to the subject of Croman's supposed lack of

consideration on his burglary charge:

Q.   Mr. Croman, just to clarify, have
you made any deal with regard to your current
burglary charge that's pending other than
to waive your right to a speedy trial?

A.   <u>No, I have not.</u> (564-565).[1]

_____

1    Other witnesses for the prosecution included Stephen
White, Cathllen Dwyer, Jamie Nimey, Mark Bentz, Linda Smith,
Sandar Gerhardt, Daneika Russell, Carl Conete, Phillip Verrenti,
Erick Duck, John Femia, Latrisha Jackson, John Sigbieny, Dale
Shackleford, Anthony Bulluck, Lance Croman, Robert Johnson,
Craig Grazier, Paul Kish, and Dr. Barbara Wolf.  <u>None of these
witnesses incriminating Young or identified him as the
perpetrator.</u>

## Summations

Notwithstanding the prosecutor's _personal_ knowledge that Croman had received a deal on his burglary case (discussed _infra_) the prosecutor lied to the jury and reinforced Croman's perjury that all Croman received in exchange for his testimony was a "transfer" of his probation. Moreover, the prosecution argued that "transfer" could not truly be considered consideration because it was undertaken for Croman's safety:

> "And, yes, we [did] offer him something to come here before you. Yeah, we did. We told him that we would have his probation transferred so he could get out of town. And I'll leave it up for you to decide why that kid wants to get out of town. And you observe why he was looking straight ahead. Do you think he wanted to look out into the audience so he could get eyeballed and intimidated?" (877).

As to Mitchell, the prosecutor explicitly relied on his testimony that Young and Gucci's dispute over drug proceeds was the motive for Gucci's murder:

> "[Consider, for example], a situation where two university students worked together on a research paper for several months and then one student turns it in with only his name on it. In that situation that student could be charged with plagiarism by the university, maybe suspended from school or even discharged from school because of that. That's how it works in our world ladies and gentlemen. But in the drug culture, in their world, a greedy partner winds up dead (838-839).

* * *

Now, apparently, at least in Reggie

13

Young's eyes, Gucci wasn't playing by the
rules. He wasn't sharing the proceeds.
And in Geno's, on January 15th, 1996, when
Reggie asked Gucci where's my shit, and
an argument ensued, and Gucci left Geno's
throwing up his hands, saying, what the
fuck, and walked out, that answer apparently
did not satisfy Mr. Young. Ladies and
gentlemn, that argument that Tyrone talked
about didn't sound like it lasted very long,
and it certainly wasn't Ali-Frazier....But
[Mitchell] knew they were beefing about
drugs, and he has said that from day one
(839-840; 842).

* * *

And by the way ladies and gentleman, just
since it's been thrown out to you, do you
think Dominican drug dealers called the
police to report a robbery? Is that what
the defense wants you believe? I'd love
to see that. Hello, officer. I've been
moving some major weight over here on Steuben
Street and some of our drugs just got ripped
off, and I got tied up and I'm naked. Could
you come over and help me, officer?
(850-851).

As discussed <u>infra</u>, the prosecutor also vouched for the
witnesses' credibility and argued the Gucci's girlfriend refused
to implicate Young because she was scared of him or his alleged
associates.

D.  **Verdict & Sentence**

The jury convicted Young of second degree murder, second
degree assault, first degree reckless endangerment and second
and third degree criminal possession of a weapon. On March
7, 1997 Young was sentenced to 25 years to life.

E.  **YOUNG'S FIRST C.P.L. §440.10 MOTION**

By motion papers dated December 3, 1997 Young moved to

vacate his conviction based on newly discovered evidence
consisting of Mitchell's admissions, several months prior to
trial, that it was he who killed Gucci.  As relevant here, in
support of Young's motion Young submitted an _original_ affidavit
from Richard Smith who overheard Mitchell's confession:

> [D]uring November, 1996 while incarcerated
> in Lakeview Annex Correctional Facility,
> State of New York ... me and Tyrone Mitchell
> became closely acquainted through mutual
> activities that we both participated in.
> Our relationship grew into a friendship
> and we discussed more personal and intimate
> matters.  We also discussed matters
> concerning his involvement in the shooting
> death of George H. Bullock (aka) Gucci.
>
> He (Tyrone Mitchell) stated he'd gotten
> busy before, and that he always kept a gat
> on him at all times.  He then stated: he
> was the person who shot Gucci in the back
> of Gucci's head with a .22 ....  He was very
> convincing and clear that it was he Tyrone
> Mitchell, who actually shot and killed George
> H. Bullock (a copy of Richard Smith's June
> 6, 1997 affidavit is annexed as Exhibit
> B).

Following Young's submission of this motion, the Court
(Donalty, J.) informed Young that it would not consider Smith's
affidavit because it was not an original.  Young wrote Judge
Donalty and informed him that he had indeed forwarded Smith's
original affidavit with his motion, and that he was forwarding
an additional copy of the affidavit for the Court's convenience.

Nevertheless, by a May 18, 1998 letter Judge Donalty,
disregarding Young's original submission, informed Young that
he would not consider Smith's affidavit as part of his motion
(a copy of Judge Donalty's May 18, 1998 letter is annexed as

Exhibit C). That state court thus never rendered any findings, factual or legal, on Young's entitlement to vacatur based upon Smith's affidavit.

## F.  YOUNG'S DIRECT APPEAL

On appeal, Young raised four issues challenging his conviction: (1) the trial court improperly denied his request for an accomplice liability charge, (2) the trial court improperly precluded him from eliciting testimony establishing other individuals had reason to harm the victim, (3) a prosecutorial misconduct issue based on the prosecutor's summation, and (4) the sentence imposed was excessive.

By an order dated November 13, 2000 the Appellate Division, Fourth Department affirmed Young's conviction. People v. Young, 277 A.D.2d 910 (4th Dep't 2000). As to the prosecutor's summation, the Appellate Division held "[t]he claimed instances of prosecutorial misconduct were not so egregious that defendant was deprived of a fair trial."

By an order dated May 31, 2001 the New York Court of Appeals denied Young's application for leave to appeal to that court. People v. Young, 96 N.Y.2d 836 (2001).

## G.  YOUNG'S SECOND C.P.L. §440.10 MOTION

By motion papers dated February 5, 2003 Young moved to vacate his conviction pursuant to C.P.L. §440.10 based upon newly discovered evidence demonstrating Mitchell perjured himself when he testified at Young's trial.

Unbeknownst to Young, on either April 18 or 21, 1997, nearly three weeks before Young was sentenced, Mitchell was interviewed by FBI Special Agent John Mulligan and NYCPD Detectives Warren Norman and Paul Van Eken at Coxsackie Correctional Facility (a copy of the May 1, 1997 FBI Report memorializing that interview is annexed as Exhibit D).

Consistent with his trial testimony, Mitchell claimed that he had been recruited by "Bed-Sty" to sell crack in Utica New York. However, Mitchell admitted that he was recruited on behalf of Randy Hutchinson, whom he denied ever working for during his testimony at Young's trial:

> "While in Utica, MITCHELL met up with numerous individuals from the PINK Houses and the CYPRESS HILLS Houses in East New York ... who ran the crack sales operation, including ...RANDY HUTCHINSON...."; "MITCHELL believed that HUTCHINSON was the leader of the crew...."

Moreover, contrary to Mitchell's carefully tailored account of the argument between "Young" and "Gucci" that supposedly preceded the murder, Mitchell admitted that his boss Randy Hutchinson had been involved in the argument over drug proceeds:

> At one point, HUTCHINSON sent GOOCHIE (sic) and possibly REGGIE YOUNG to rob a Dominican drug spot. GOOCHIE later returned to GENO's and informed HUTCHINSON that he had stolen a gun, but less drugs than he had actually taken.
>
> HUTCHINSON and YOUNG began to argue with GOOCHIE about it, and GOOCHIE left the bar. HUTCHINSON then stated to YOUNG, 'He's got to go...tonight'.

Neither this report or the information it contained were

17

disclosed to Young.

On October 29, 1997 Mitchell was interviewed again, this time by FBI Special Agent John Mulligan, NYCPD Detective Warren Norman and Assistant United States Attorney Sam Buell (a copy of the November 6, 1997 FBI Report memorializing that interview is annexed as Exhibit E). During that interview, Mitchell was even more explicit about his employment for Hutchinson and Hutchinson's declaration that Gucci had to go:

> MITCHELL had first been recruited to sell
> crack in RANDY HUTCHINSON'S drug operation
> in Utica, New York, by BED-STUY
> (KENNEY)....HUTCHINSON advised MITCHELL
> that he had a drug operation in Utica since
> approximately 1988. MITCHELL was one of
> a number of young males brought up to Utica
> to sell for the drug organization, and was
> paid $200.00 out of each $1,000.00 'bomb'
> of crack sold.
>
> One night in January, 19[9]6, MITCHELL was
> present in GENO's bar when HUTCHINSON and
> REGGIE YOUNG were arguing with GUCCI
> (George Bullock), accusing BULLOCK of keeping
> more money and/or drugs than he was entitled
> to, following a robbery. BULLOCK threw
> up his hands, stated 'Fuck this shit', and
> walked out.
>
> HUTCHINSON then stated to YOUNG, 'He's gotta
> go.'"

As with May 1, 1997 FBI Report neither the November 6, 1997 FBI Report or the information it contained were disclosed to Young. Young discovered and obtained the FBI Reports in June 2002 from Randy Hutchinson who was then serving a federal sentence in the Fairton Federal Correctional Facility in New Jersey.

## H.  YOUNG'S THIRD C.P.L. §440.10 Motion

By a motion dated August 5, 2004 Young moved to vacate his conviction based upon the prosecution's subornation of perjured testimony.  Following conviction, Young obtained evidence (from his trial attorney's case file) indicating that contrary to Croman's trial testimony that there was "no deal[] whatsoever" on his burglary charge, there was in fact just such a deal.  Moreover, contrary to Croman's claim that he was merely promised that his probation would be transferred out of state, the prosecution represented they would have it terminated.

Supporting these facts was a February 25, 1997 memorandum from Onieda ADA Scott McNamara to Young's trial prosecutor 1st Onieda ADA Bernadette Romano stating in relevant part:

> Lance currently has a burglary in the second degree charge pending in our office.  We have agreed to delay indicting Lane with the understanding he waives his speedy trial rights and continue to cooperate with our office....Although Lance has never been advised of this, it is the People's contention that if Lance continues to fully cooperate with the District Attorney's Office (including testifying if called at the People v. Reggie Young case) Lance would be allowed to plead guilty to larceny with a sentence of approximately sixty days which would amount to the time that he has served.

> Also, if he fully cooperates, the People will attempt to have Lance's probation either transferred or terminated if he makes total restitution.... (Exhibit F).

The August 12, 1999 transcript from Croman's probation case, People v. Lance Croman, Onieda County Indictment Number 94-265 (annexed as Exhibit G), establish that Croman's probation

was in fact terminated as opposed to merely being transferred:

> THE COURT: You haven't been reporting to probation, I presume.
>
> THE DEFENDANT: See, your Honor, I was brought out of state for helping in a murder and was not told to report, and I was told --
>
> THE COURT: So you were on probation but didn't have to report, is that it?
>
> THE DEFENDANT: I did 16 months on the probation and two months on that. I was told just to pay the restitution

Despite this evidence, the Court (Donalty, J.) denied Young's motion. First, the court held that since Croman was not personally aware of the deal he received, his testimony was not perjured:

> The defendant provided this Court with a copy of an interoffice memorandum from the District Attorney's Office dated February 25, 1997 which was sent from Assistant District Attorney Scott McNamara to Assistant District Attorney Bernadette Romano. In it, Mr. McNamara states that the witness was never advised of any benefit that he may receive in exchange for his testimony at the trial. As a result, [Croman] clearly did not perjure himself on the stand (Order at 3).

The court also held that Young's subornation of perjury claim was procedurally barred pursuant to C.P.L. §440.10(2)(a) due to Young's assertion of an unrelated prosecutorial misconduct claim on direct appeal.

As to Young's ineffective assistance of trial counsel claim --based on tria counse's failure to take action in the fact of Croman's rampant perjury-- the court held that claim

was barred pursuant to C.P.L. §440.10(2)(c) in that sufficient facts to raise the claim on appeal appeared on the trial record (Order at 4). On January 4, 2006 the Appellate Division, Fourth Department denied Young's application for leave to appeal.

## I.   Young's Federal Habeas Proceedings

In September 2003 Young filed his petition for a writ of habeas corpus.   The Court subsequently stayed this proceeding pending the state court's resolution of Young's second C.P.L. §440.10.   Subsequently, the Court expanded the terms of that stay to provide that this action would remain stayed pending the state court's resolution of Young's third C.P.L. §440.10 motion.

On or about March 6, 2006 Young filed his motion for permission to amend his habeas petition to include his C.P.L. 440.10 issues.

YOUNG'S FEDERAL RIGHT TO DUE PROCESS WAS
VIOLATED BY (A) THE PROSECUTION'S SUBORNATION
OF ITS STAR WITNESS'S PERJURED TESTIMONY
DENYING THE CONSIDERATION EXTENDED TO HIM
IN EXCHANGE FOR HIS TESTIMONY, (B) THE
PROSECUTION'S OTHER STAR WITNESS'S PERJURED
TESTIMONY SUPPRESSING THE FACT THAT HIS
EMPLOYER IN THE DRUG TRADE, WHOM HE DENIED
WORKING FOR, HAD THE NIGHT BEFORE THE MURDER,
DECLARED THAT THE VICTIM HAD TO BE MURDERED,
AND (C) THE PROSECUTION'S FALSE SUMMATION
CAPITALIZING ON ITS TWO STAR WITNESSES'
PERJURED TESTIMONY. U.S. CONST. AMENDS.
V, XIV.

## A.    Introduction

The prosecution's case against Young was built on the
testimony of two witness: (1) three time liar Tyrone Mitchell,
who claimed that the night prior to the murder, he overheard
Young and Gucci argue over the proceeds of a robbery and, the
next day, witnessed Young kill Gucci, and (2) Jailhouse snitch
Lance Croman, who claimed that while he and Young were
incarcerated prior to trial, Young confessed that he committed
the murder.  The prosecution held both of these witnesses out
to the jury as good Samaritans, who notwithstanding their previous
criminal conduct, had come forth to testify against Young out
of civic duty and in spite of their fear of testifying.  In
reality, nothing was further from the truth.

As to Croman, the prosecution sat by silently as he gave
false testimony regarding the consideration he received in
exchange for testifying against Young.  Croman repeatedly denied
that there was "any" deal on his burglary case and claimed all
he received from the prosecution was a promise that his probation

would be transferred out of state following his testimony.  At
the time Croman gave this testimony the trial prosecutor was
personally aware that in exchange for Croman's testimony, Croman's
pending burglary charge would be reduced to petty larceny and
he would be immediately released from prison.  Moreover, the
trial prosecutor was personally aware that rather than merely
promising to have Croman's probation "transferred", the
prosecution intended to have Croman's probation obligations
terminated.

As to Mitchell, he testified that he never sold drugs for
Randy Hutchinson --a local drug dealer-- and that the night prior
to the murder, he overheard Young and Gucci arguing over the
proceeds of a robbery they supposedly committed.  In truth,
Mitchell sold drugs for Hutchinson,  Hutchinson himself had
dispatched Gucci to commit the robbery, and Gucci cheated
Hutchinson out of the robbery proceeds, following which Hutchinson
declared that Gucci "had to go, tonight."  Neither  the defense
or the jury ever learned that Mitchell heard --and later admitted
carrying out-- his boss's order to murder Gucci.        As if
this outrageous perjury was not enough, the prosecutor used her
summation to repeatedly vouch for these two disreputable
characters (Croman and Mitchell) as uninterested witnesses and
affirmed their false testimony.  The cumulative impact of these
unconsciousable violations compel habeas relief in Young's
case.

B.        **The Applicable Legal Standards**

Because there is a "grave danger" that if a cooperating witness is "weak or unscrupulous, he will not hesitate to incriminate others to further his own self interest", any agreement between the prosecution and a witness, entered into to induce his testimony must be disclosed.   People v. Savvides, 1 N.Y.2d 554, 557 (1956); Giglio v United, 405 U.S. 150 (1972); United States v. Bernal-Obeso, 989 F.2d 331, 333 (9th Cir. 1993)("By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom.").

It is not the label or form the parties give to their arrangements that triggers the duty to disclose.  People v. Novoa, 70 N.Y.2d 490, 497 (1987).  The obligation does not turn on whether the arrangement is "technically ... a promise" or a "binding contract".  United States v. Bagley, 473 U.S. 667 (1985).  Nor must a defendant "directly demonstrate the existence of an express promise." People v Cwikla, 46 N.Y.2d 434, 442 (1972).  Rather, the prosecution must disclose any facts which might induce the witness to "expect" some benefit from the prosecution, Novoa, 70 N.Y.2d at 497, or even "hope" for such a benefit.  Cwikla, 46 N.Y.2d at 441; Brown v Wainwright, 785 F.2d 1457 (11th Cir. 1986)("[t]he constitutional concerns address

24

the realities of what might induce a witness to testify falsely, and the jury is entitled to consider these realities in assessing credibility.").

Even in absence of a quid pro quo with a witness, the prosecution must disclose any facts that provide a witness with a potential motive, bias, or interest in testifying. See e.g. People v. Wright, 86 N.Y.2d 591, 595 (1995)(reversible error for People to fail to disclose that an important witness had a potential motive to falsify because he previously had been a police informant; there was no evidence he had any kind of deal to receive benefit in this case); People v. Cwikla, 46 N.Y.2d 434, 442 (1979)(reversible error where there was no "express promise" but People failed to disclose circumstances from which witness's possible "expectation of leniency" could be inferred); People v. Wallert, 98 A.D.2d 47 (1st Dep't 1983)(reversible error where People failed to disclose a complainant's consultation with a civil lawyer about a potential civil damage action which gave rise to a potential motive, bias or interest); People v. Ford, 41 A.D.2d 550, 551 (2d Dep't 1973)(disclosure of existence of charges against witness required, even though it was "clear that no explicit promises of leniency or consideration were extended [by prosecutors]," because of the "possibility" that witnesses "had the impression that their testimony incriminating the defendant would be rewarded with at least some 'consideration'").

The obligation of the prosecution to prove its case with only truthful evidence is the very foundation upon which due process rests: "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" Giglio, 405 U.S. at 153; Mooney v. Holohan, 294 U.S. 103 (1935). For this reason, a prosecutor's obligations do not end with disclosure but extend to correcting mistakes and falsehoods by a witness whose testimony on a particular subject is erroneous. People v. Steadman, 82 N.Y.2d 1, 7 (1993). For example, if a witness mischaracterizes or falsely denies a promise, a prosecutor must "by immediate statement of his own or by further appropriate examination ... forthrightly expose the lie, so that the court and jury [will know] that the witness had reason to expect lenient treatment for 'continued ... cooperation.'" Savvides, 1 N.Y.2d at 556-557.

When the prosecution breaches its duty to correct its witness's perjured testimony, a defendant's conviction must be vacated if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97 (1976). As the Second Circuit stated in Su v. Filion, 335 F.3d 119 (2d Cir. 2003), "if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic" quoting United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991). A prosecutor's false summation is the functional

26

equivalent of knowingly using perjured testimony and is evaluated under the same materiality standard.  See Brooks v. Kemp, 762 F.2d 1383, 1402 n.29 (11th Cir. 1985), vacated on other grounds, 478 U.S. 1016 (1986), remanded, 837 F.2d 1474 (11th Cir. 1988).

So long as the the prosecution is aware that the testimony being presented is false, it does not matter that the witness had no knowledge of the falsity of his testimony.  See Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005)("Napue forbids the knowing presentation of false evidence by the State in a criminal trial, whether through direct presentation or through covert subornation of perjury.").  Similarly, even if the prosecution has absolutely no knowledge that it witness perjured himself, reversal is still required if "the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would likely not have been convicted.'" Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003).

Moreover, notwithstanding the AEDAPA's "contrary to" or an "unreasonable application of" clearly established federal law, the prohibition of the state covertly presenting perjury has long been clearly established and as demonstrated below, demand habeas relief in Young's case:

> The State contends that there was no Napue
> [1959] violation because [the witness] did
> not commit perjury.  According to the State,
> Napue renders unconstitutional only acts
> of perjury....The State is wrong.  Napue,
> by its terms, addresses the presentation
> of false evidence, not just subornation
> of perjury.  Id. at 980-981.

Accord <u>Ortega v. Duncan</u>, 333 F.3d     (2d Cir. 2003)(a post-AEDPA
case in which the court, citing <u>Sanders</u>, granted habeas relief
based upon the prosecution's use of perjured testimony,
notwithstanding the absence of evidence that the prosecution
was aware of that perjury).

## C.   The Perjured Testimony & False Summation At Young's Trial

### 1.   Lance Croman

Croman was one of the prosecution's two star witnesses.
He claimed that while he and Young were incarcerated in Onieda
County jail prior to Young's trial, Young confessed that he
murdered Gucci.   Croman's testimony solidified Mitchell's claim
that Young was the killer and, considering Mitchell's credibility
problems, was arguably the strongest evidence against Young.
<u>Arizona v. Fulminante</u>, 499 U.S. 279 (1991)("A confession is like
no other evidence.   Indeed, the defendant's own confession is
probably the most probative and damaging evidence that can be
admitted against him....").   The prosecution falsely represented
that Croman, in exchange for his testimony, was merely having
his probation transferred to protect him from Young's retaliation.

In actuality, Croman secured a substantial consideration
from the prosecution in exchange for his testimony: his burglary
charge was reduced to petty larceny and he was immediately
released from prison and, other than restitution, his probation
obligations were totally terminated.   When Young's trial attorney
attempted to confront Croman with the McNammara memorandum
establishing his testimony to the contrary was false, the trial

prosecutor objected and sought to shield Croman from further
questioning. When the Judge directly asked Croman if he was
receiving a deal, he repeatedly denied that was the case, claiming
there was no deal on the burglary charge "whatsoever". These
facts are virtually identical to the ones that led to habeas
relief in Hayes v. Brown, 399 F.3d 972 (9th Cir. 2005).

There, the prosecution reached an agreement with the attorney
for a prosecution witness that in exchange for the witness's
testimony against the defendant, three felony charges pending
against the witness would be dismissed. The prosecutor then
had the witness's attorney promise that he would not tell the
witness about the deal. "The idea was that [the witness] would
be able to testify that there was no deal in place, without
perjuring himself, because [the witness] would not personally
be informed of the arrangement." Id. at 977. The court condemned
the prosecution's scheme and concluded that "[t]he State's actions
violated [the defendant's] rights first under Napue, by presenting
false evidence to the jury and, second, under Alcorta and Pyle,
by failing to correct the record following the presentation of
false evidence." Id.

Hayes' rationale applies all the more forcefully here.
Rather than forthrightly correcting Croman's perjury, the
prosecutor --who was personally aware of its falsity-- reinforced
it on redirect and her summation:

> Q. Mr. Croman, just to clarify, have
> you made any deal with regard to your current
> burglary charge that's pending other than
> to waive your right to a speedy trial?
>
> A. No, I have not (564-565).

29

The remedy for this egregious misconduct is "automatic" reversal of Young's conviction.  Su v. Filion, supra.[1]

## 2.  **Tyrone Mitchell**

By the prosecution's own admission, Tyrone Mitchell was the linchpin of its case: "Let's face, ladies and gentlemen, this case comes down to whether you believe Tyrone or not...." (Summation: 879-880).  This good Samaritan claimed that the night before the murder, he overheard Young and Gucci argue over the proceeds of a robbery and the next day, watched as Young murdered Gucci.

We now know that Mitchell's testimony regarding the alleged argument was carefully tailored so as hide the fact that (1) he was selling drugs for Randy Hutchinson, (2) he was brought to Utica, New York solely for that purpose, (3) Hutchinson had

---

[1]    The prosecutor's subornation of perjury cannot be excused because Young's trial attorney possessed the McNammara memorandum and did not pursue further cross-examination of Croman. See Jenkins v. Artuz, 294 F.3d 284, 296 (2d Cir. 2002)("Finally, the prosecutor's actions cannot be overlooked on the ground that Jenkins's counsel did not continue to seek to gain an admission from Morgan as to the plea agreement.  Further questioning by defense counsel could have prejudiced Jenkins.  When a prosecutor throws his or her weight behind a falsely testifying witness, 'challenging the witness's statement ... runs the risk of implicating the credibility of the prosecutor before the jury. Even prosecutorial silence 'harm[s]' defendants, who are unable 'to respond effectively.'")(internal citations omitted); Belmontes v. Woodford, 335 F.3d 1024, 1044-45 (9th Cir. 2003) ("...[R]egardless of whether defense counsel should have known that a state witness testified falsely, a prosecutor's responsibility and duty to correct what he knows to be false and elicit the truth requires him to act when put on notice of the real possibility of false testimony.")(internal citations and alterations omitted).

dispatched Gucci to commit a robbery, (4) Hutchinson believed Gucci cheated him out of the proceeds of that robbery, (5) Hutchinson argued with the Gucci, and (6) after the argument, Hutchinson, in Mitchell's presence, declared that Gucci had to be murdered.

Had Young had this information he could have made a devastating argument that Mitchell murdered Gucci at the direction of his boss's orders. After all, there was already strong evidence pointing to Mitchell's culpability in Gucci's murder. Mitchell walked into Rome Hospital shortly after the shooting suffering from a gunshot wound and lied to friends and police that he had been shot during a botched robbery. When the police teletype came in regarding Gucci's murder and the police became suspicious of Mitchell's claims, he changed his story and claimed that "Gucci" had shot him with .357 magnum, a weapon the police coincidentally recovered from the crime scene. Still later, Mitchell changed his story again and claimed that he shot himself.

It was only when it became obvious that the police did not buy Mitchell's tales that he came up with his final version: he was in the car when Gucci was murdered, but it was Young who committed the crime. Had Young been able to demonstrate that Mitchell was one of Hutchinson's employees, and that Hutchinson had given the order to have Mitchell murdered, it would have cast substantial doubt on the prosecution's implicit claim that Mitchell had no reason to murder Gucci and thus no reason to lie on Young. As this evidence bore directly on Mitchell's motive to lie, it was crucial to Young's case (subpart B, _supra_).

Indeed, the significance of such evidence simply cannot be overstated. For example, in Mendez v. Artuz, 303 F.3d 411, 414 (2d Cir. 2003), the Court of Appeals noted that such evidence is favorable to a defendant as "it directly contradicts the motive theory testified to by prosecution witnesses." citing, United States v. Zuno-Arce, 44 F.3d 1420, 1426 (9th Cir. 1995). While Mendez involved a Brady violation by virtue of the prosecution's suppression of such evidence, the central principle of the case holds true here: evidence that would have discredited the motive theory upon which the prosecution relies can lead to a different outcome of a trial. That is especially so here where the prosecution's false summation made Mitchell's deceptively tailored motive theory the central theme of summation.

Finally, Mitchell's perjury deprived Young of the factual basis for securing an accomplice-liability charge. Such a charge would have informed the jury that it could not convict Young solely upon the basis of Mitchell's testimony. As revelation of Croman's perjury would have "devastated" his and the prosecution's credibility, the jury would have likely rejected Mitchell's testimony under the accomplice-liability doctrine had it been given a chance to do so. It was not, however, because there was "no evidence presented from which a jury could reasonably infer that [Mitchell] participated in the offenses...." People v. Young, 277 A.D.2d 910 (4th Dep't 2000). Had the court known of the suppressed facts in addition to Mitchell's presence in the car where Gucci was murdered and his numerous lies to police, it would have likely submitted the question of Mitchell's

accomplice status to the jury for consideration and thereby raised the bar for conviction.

Accordingly, considered collectively with Croman's perjury, or independently, Mitchell's perjury is sufficient to leave this Court with a "firm conviction" that but for the perjured testimony, Young would not have been convicted. Sanders, supra.

D. **The State Court's Reasons For Rejecting Young's Perjury Claims Were Fallacious**

The state court denied Young's perjury claim regarding Croman's deal on his burglary case on the ground that Croman did not commit perjury, i.e., as the McNammara memorandum stated Croman was never advised of any benefit he might receive on his burglary charge in exchange for his testimony, he "clearly did not perjure himself on the stand." But that conclusion is irrelevant. As stated in Hayes v. Brown, 399 F.3d 972, 981 (9th Cir. 2005), "[i]t is reprehensible for the State to seek refuge in the claim that a witness did not commit perjury, when the witness unknowingly presents false testimony at the behest of the State. 'This saves [the witness] from perjury, but it does not make his testimony truthful.'" Indeed, the Hayes court held the fact that the witness was not complicit in the falsehood makes it "all the more likely to affect the judgment of the jury." Id. at 981. The state court's denial was thus unjustifiable.

Second, the state court denied Young's perjury claim regarding Croman's probation on procedural grounds. The state court invoked C.P.L. §440.10(2)(a) claiming that the issue of "prosecutorial misconduct" was previously determined on Young's direct appeal. But the "prosecutorial misconduct" issue

33

determined on Young's direct appeal <u>was based solely on the</u> <u>prosecutor's summation</u> and had nothing to do with Croman's perjury. Indeed, it was impossible for Young to challenge Croman's perjury on direct appeal as the factual predicate of that claim --the McNamara memorandum and Croman's August 12, 1999 transcripts-- was not part of the appellate record. The state court's invocation of C.P.L. §440.10(2)(a) was thus nothing more than an obvious excuse to justify denying relief on claims that demanded "automatic" reversal.

Such an obviously pretextual invocation of a state procedural bar is "inadequate" to constitute a recognizable procedural default under federal law and presents no hurdle to this Court's ability to grant relief. <u>See</u> <u>e.g.</u>, <u>Silverstein v. Henderson</u>, 706 F.2d 361, 369 n.11 (2d Cir. 1983)(noting that "an unsupported or manipulative finding of procedural default would not constitute an adequate state ground barring federal relief."); <u>Williams</u> <u>v. Lane</u>, 826 F.2d 654, 660 (7th Cir. 1987)(refusing to find petitioner's issue procedurally defaulted under federal law where it was clear from the record that petitioner complied with the state procedural rule).

Finally, as to Mitchell's perjury, the state court denied relief on procedural grounds, i.e., because Young raised a "prosecutorial misconduct" issue on direct appeal and because the appellate record allegedly permitted him to raise the other issues asserted in his C.P.L. §440.10 motion. That conclusion was <u>absurd</u> as (1) Mitchell's FBI interviews were not even memorialized until May and November 1997, <u>after</u> Young's trial,

and (2) Young did not discover and obtain the FBI reports until June 2001. The state court's denial in this regard must thus be rejected as unsupported and manipulative. <u>Siliverstein</u>, <u>supra</u>; <u>Williams</u>, <u>supra</u>. Accordingly, the state's basis for excusing the perjury introduced at Young's was fallacious.

E.  **An Evidentiary Hearing Is Required On Young's Application**[2]

An evidentiary hearing is mandatory in Young's case as (1) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing, (2) material facts were not adequately developed at the state court hearing, (3) the state court's factual determinations are not fairly supported by the record as a whole, and (4) the prosecution has to this day refused to make full disclosure of the circumstances surrounding Croman's cooperation. <u>See</u> <u>Townsend v. Sain</u>, 372 U.S. 293 (1963); <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992); <u>Douglas v. Calderon</u>, No. CV 91-3055 (C.D. Cal. June 11, 1996)(The AEDPA's silence "suggests that the Act was not

_____

2    28 U.S.C.  2254 (e)(2) does not bar this court from conducting an evidentiary hearing in this case as the state court denied Young's request for an evidentiary hearing.  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 420 (2000)("By its terms of [ 2254 (e)(2)] applies only to prisoners who have 'failed to  develop the factual basis of a claim in'" State court proceeding; "We agree ... that 'failed to develop' implies some lack of diligence on petitioner's part...."); <u>Jones v. Woods</u>, 114 F.3d 1002, 1014 (9th Cir. 1997)(holding that "[w]here, as here, the state courts simply fail to conduct an evidentiary hearing, the AEDPA does not preclude a federal evidentiary hearing on otherwise exhausted habeas claims."); <u>Cannon v. Mullin</u>, 383 F.3d 1152, 1176 (10th Cir. 2004)("If the prisoner did not 'fail[] to develop the factual basis of [his] claim in state court,  2254 is not applicable and a federal habeas court should proceed to analyze whether a[n evidentiary is appropriate or required under pre-AEDPA standards.'")(internal citations omitted).

intended to overrule Townsend. The Act specifically provides for one circumstance when a federal court may not hold an evidentiary hearing, it does not otherwise restrict when a court may hold one. Therefore, a federal petitioner would still be entitled to an evidentiary hearing if he did not receive a full and fair hearing in state court."); <u>Wilkins v. Delo</u>, No. 91-0861-CV-W-5 (W.D. Mo. May 15, 1996)(same).

Accordingly, should the court decline to summarily grant Young's petition, an evidentiary hearing should be conducted on it.

THE STATE'S REJECTION OF CLEAR EVIDENCE
ESTABLISHING YOUNG'S INNOCENCE VIOLATED
YOUNG'S RIGHT TO DUE PROCESS. U.S.
CONST. AMEND. V, XIV.

In his first C.P.L. §440.10 motion, Young obtained an
affidavit from Richard Smith detailing how prior to trial, Tyrone
Mitchell admitted to him that it was he, not Young, who murdered
Gucci. Along with several additional affidavits, Young submitted
Smith's original affidavit to state court in support of newly
discovered evidence claim. On April 6, 1998 the state court
initially rejected Young's motion, erroneously finding that,
inter alia, Smith's affidavit was not an original.

Young wrote the court back and explained that he had indeed
submitted Smith's original affidavit to with his motion and
submitted a courtesy copy of that affidavit with his letter.
Nevertheless, the court inexplicably claimed that since Young
had not submitted Smith's original affidavit, it would not
consider in resolving Young's motion. The court's refusal to
consider that evidence violated Young's right to due process.

In Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003),
the Second Circuit reiterated the settled principle that a claim
based on newly discovered evidence has never been held to state
a ground for federal habeas relief absent an independent
constitutional violation occurring in the underlying state
criminal proceeding. In order for habeas relief to issue, "a
due process violation must have occurred at [the petitioner's]

37

trial." Id. at 108. To merit such a conclusion, a petitioner must demonstrate that false testimony was introduced which was of such a nature that the court is left with a firm belief that but for the perjury testimony, the defendant would most likely not have been convicted. Id. at 108.

Mitchell's admission to Smith was precisely the type of evidence that would have satisfied that criterion. Smith and Mitchell had been incarcerated together prior to trial at Lakeview Correctional Facility. The two men became friends and Mitchell later admitted to Smith that he killed Gucci. The evidence corroborating Mitchell's declaration is substantial and there is every reason to believe Mitchell did in fact make the confession.

Moreover, while Mitchell submitted an affidavit opposing Smith's claims in state court, because the state court refused to consider Smith's affidavit, the factual dispute created by these conflicting accounts was not resolved. This factual dispute, at the very least, requires an evidentiary hearing on Young's petition as material facts were not adequately developed at the state court hearing. See Townsend v. Sain, 372 U.S. 293 (1963); Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992); Douglas v. Calderon, No. CV 91-3055 (C.D. Cal. June 11, 1996)(a federal petitioner would still be entitled to an evidentiary hearing if he did not receive a full and fair hearing in state court."); Wilkins v. Delo, No. 91-0861-CV-W-5 (W.D. Mo. May 15, 1996)(same).

Yet the state court denied this issue because Young purportedly failed to present Smith's original affidavit. First, as Young explained in the court below, his initial motion did in fact contain Smith's original affidavit. The court apparently "overlooked" this fact as it did when it erroneously claimed another affidavit submitted in support of the motion (by Kenneth Watson) was not notarized.

Second, even if Smith's affidavit was merely a copy, there was no federally recognized rule authorizing a state court to disregard evidence of a defendant's innocence and a prosecution witness's perjury merely because the prosecution witness's declaration against penal interest was not contained in "an original affidavit." Indeed, both state and federal rules of evidence allow such declarations to be introduced by direct testimony, through business records, or any other means that satisfy the applicable evidentiary rules. This is especially so as Young's affidavit --which C.P.L. §440.30 permitted to be made upon information and belief-- established the factual predicate for the claim.

Third, considering the equities in the case and that Smith could have simply been subpoenaed, it was unreasonable to totally disregard Smith's affidavit on that basis. On countless occasions attorneys submit copies rather than originals and this was simply a situation over which Young had no control as he initially submitted his original affidavit to the court. Under these circumstances, the state court's rejection of his

claim cannot be reconciled with federal law.

## POINT III

THE PROSECUTION'S HIGHLY PREJUDICAL SUMMATION VIOLATED YOUNG'S RIGHT TO DUE PROCESS. U.S. CONST. AMEND. V, XIV.

Following the prosecution's presentation of its utterly false case, it crowned its presentation with a unbridled summation attacking the defense. In summation, the prosecution:

1. Vouched for Croman and Mitchell's credibility;

2. Endorsed Mitchell's false account of the argument preceding the shooting;

3. Lied that the "transfer" of probation Croman received was for safety reasons;

4. Argued Croman was scared of testifying because of Randy Hutchinson's presence in the courtroom;

5. Capitalized on the fact that the court denied an accomplice liability charge by telling the jury it they would not hear such a charge when the court gave them the applicable law;

6. Argued, with absolutely no support in the record, that Young's presence at Geno's bar shortly after the murder could be explained by concluding Mitchell's employer Randy Hutchinson gave Young a ride from the murder scene; and

7. Argued Latrisha Jackson was afraid to testify because Young's alleged criminal associate Randy Hutchinson was sitting in the audience;

Considered with the rampant perjury at Young's trial, the prosecution's summation independently violated Young's right to due process.

As the Supreme Court explained in Berger v. United States, 295 U.S. 78 (1935):

40

> The United States Attorney is the
> representative not of any ordinary party
> to a controversy, but of a sovereignty whose
> obligation to govern impartiality is as
> compelling as its obligation to govern at
> all; and whose interest, therefore, in a
> criminal prosecution is not that it shall
> win a case, but that justice shall be done.
> As such, he is in a peculiar and very
> definite sense the servant of the law, the
> twofold aim of which is that guilty shall
> not escape or innocence suffer.  He may
> prosecutor with earnestness and vigor-indeed,
> he should do so.  But, while he may strike
> hard blows, he is not at liberty to strike
> foul ones.  It is as much his duty to refrain
> from improper methods calculated to produce
> a wrongful conviction as it is to use every
> legitimate means to brings about a just
> one.

To obtain habeas relief based upon a prosecutor's improper
summation, a petitioner must demonstrate that the summation
"so infected the trial with unfairness as to make the resulting
conviction a denial of due process." Donnelly v. DeChristofor,
416 U.S. 637 (1974); Tankleff v. Senkowski, 135 F.3d 235, 252-
53 (2d Cir. 1998)(To obtain relief on a prosecutorial misconduct
claim, the court must find that the prosecutor's comments
constituted "more than mere trial error, and were instead so
egregious as to violate the defendant's due process rights.");
Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990)("The
appropriate standard of review for a claim of prosecutorial
misconduct on a writ of habeas corpus is "the narrow one of
due process, and not the broad exercise of supervisory power.").

Normally, a petitioner is required to demonstrate he
suffered "actual prejudice" because the prosecutor's comments
during summation had a substantial and injurious effect or

41

influence in determining the jury's verdict. <u>Bentley v. Scully</u>, 41 F.3d 818, 824 (2d Cir. 1994). That standard, however, must be relaxed in light of the prosecution's <u>false</u> summation regarding the consideration Croman received was perjured as was her motive theory provided by Mitchell's testimony.

As previously stated, a prosecutor's false summation is the functional equivalent of knowingly using perjured testimony. <u>See</u> <u>Brooks v. Kemp</u>, 762 F.2d 1383, 1402 n.29 (11th Cir. 1985), <u>vacated  on other grounds</u>, 478 U.S. 1016 (1986), <u>remanded</u>, 837 F.2d 1474 (11th Cir. 1988). Likewise, it is improper for a prosecutor  to vouch for the credibility of his witnesses. <u>See</u> <u>United  States v. Edwards</u>, 154 F.3d 915 (9th Cir. 1998). Such a summation warrants reversal under the same standard as does the knowing use of perjured testimony, <u>Brooks v. Kemp</u>, 762 F.2d 1383, 1402 n.29 (11th Cir. 1985), <u>vacated on other grounds</u>, 478 U.S. 1016 (1986), <u>remanded</u>, 837 F.2d 1474 (11th Cir. 1988), i.e., the "any reasonable likelihood" standard. As the prosecutor's improper summation is amply detailed above and in Young's appellate briefs, they need not be rehashed here. Suffice it to say that under this lenient standard, habeas relief is required.

B.   <u>The State Court's Basis For Denying Young's Challenge</u>
     <u>To The Prosecution' Summation Was Fallacious</u>

Despite the prejudicial nature of the prosecutor's comments, the state court found that the prosecutor's summation was not so egregious as to deny Young a fair trial. While that conclusion is, to say the least, unsupported by the record,

it fails miserably when considered with the totality of the
prosecution's conduct discussed above.

## POINT IV

YOUNG WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL BY VIRTUE OF HIS TRIAL
ATTORNEY'S INEXPLICABLE FAILURE TO DEMAND
RELIEF IN THE FACE OF CROMAN'S PERJURY.
U.S. CONST. VI.


In order to establish ineffective assistance of counsel
under the United States Constitution, a defendant must
demonstrate (1) his trial attorney's performance was
professionally objectively deficient, and (2) he was prejudiced
by trial counsel's conduct, in that there is a "reasonable
probability" that but for the challenged conduct the outcome
of the proceeding would have been different.  See Strickland

Strategic choices "'made after less than complete
investigation are reasonable precisely to the extent that
reasonable professional judgments support the limitations on
investigation." Gersten v. Senkowski, 299 F.Supp.2d at 100
(quoting Strickland, supra); see, Towns v. Smith, 395 F.3d 251,
258 (6th Cir. 2005)("A purportedly strategic decision is not
objectively reasonable 'when the attorney has failed to
investigate his options and make a reasonable strategic choice
between them.'").

As detailed in the Statement of Facts, when trial counsel
cross-examined Lance Croman, he possessed the McNamara memorandum
demonstrating Croman's testimony was perjurious.  Nevertheless,

when Croman staunchly denied the deal on his burglary case and the true consideration extended with respect to his probation, counsel did not demand that the court address this matter.

Instead, he dropped the matter and allowed the prosecution to reinforce Croman's perjury on redirect. At the very least, trial counsel could have showed the McNamara to the court, thus alerting it to Croman's perjury, and asked that Croman's testimony be stricken or for an appropriate charge. Counsel's utter failure to demand any action, however, was inexcusable.

## CONCLUSION

YOUNG'S CONVICTION SHOULD BE VACATED AND
A WRIT OF HABEAS CORPUS ISSUE.

REGGIE YOUNG
Petitioner
97A4733
P.O. Box 4000
Stormville, New York
12582-0010

March 7, 2006