UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

REGGIE YOUNG,

            Petitioner,

   vs.

CHARLES GREINER,

          Respondent.

Case No. 9:02-CV-1087 (JKS)

APPEARANCES:                      OF COUNSEL:

REGGIE YOUNG
97-A-4377
Greenhaven Correctional Facility
P.O. Box 4000
Stormville, New York 12582
Petitioner, pro se

ANDREW M. CUOMO           Ashlyn Dannelly, Esq.
Attorney General of the State of New York   Jennifer L. Johnson, Esq.
120 Broadway                    Assistant Attorneys General
New York, New York 10271

JAMES K. SINGLETON, JR.
Senior United States District Judge

## MEMORANDUM-DECISION AND ORDER

Reggie Young, a state prisoner proceeding pro se, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 1997 judgment of conviction entered in the County Court of Oneida County on one count of Murder in the Second Degree, one count of Assault in the Second Degree, one count of Reckless Endangerment in the First Degree, two counts of Criminal Possession of a Weapon in the Second Degree, and two counts of Criminal Possession of a Weapon in the Third Degree. He seeks relief on the grounds that his due process rights were violated by: (1) the prosecution's failure to disclose certain *Brady/Giglio* material; (2) the prosecution's subordination and use of false testimony; (3) the prosecution's misconduct during summation; (4) ineffective assistance of trial counsel; and (5) the state court's rejection of his post-conviction evidence. Docket No. 55 (Amended Pet. and Mem.). The Government has filed an Answer

1

disputing all of Petitioner's grounds for relief.  Docket Nos. 64 (Answer); 66 (Mem.).  Petitioner has filed a Traverse.  Docket No. 69.

## BACKGROUND

I - Trial

On February 22, 1996, Petitioner was indicted for the murder of George Bullock (a.k.a. "Gucci"), the assault of Tyrone Mitchell, and other related crimes.  Docket No. 65, Attach. 1. Petitioner was tried before a jury in the County Court, Oneida County between February 27th and March 7th, 1997.  *See* Docket No. 65, Attachs. 40 and 41.

The prosecution's key witness, Tyrone Mitchell, testified that he moved to Utica in the summer of 1995 to deal drugs for Clayton Johnson (a.k.a. Sty) and Johnson's girlfriend, Stacy. Docket No. 65, Attach. 40 at 196-200.  Mitchell was 17 years old when he moved to Utica and 18 at the time of the murder.  *Id.* at 197.  During his time in Utica, Mitchell had become acquainted with Petitioner, Bullock, and Randy Hutchinson at a local bar called Geno's.  *Id.* at 201-06.  On the evening of January 15, 1996, Mitchell was at Geno's, where he saw Petitioner and Bullock argue. *Id.* at 20-08.  While he was not entirely sure what they were arguing about, he heard Petitioner ask "Where's my shit at?" and observed Bullock a few minutes later throw up his hands and say "Fuck this" right before leaving the bar.  *Id.* at 208.

The next evening Mitchell was hanging out at Geno's.  *Id.* at 212.  Although Petitioner was also present at the bar, they neither conversed nor sat together.  *Id*.  Around 10:00 or 10:15 p.m.,[1] Bullock pulled up in front of Geno's in his girlfriend's car.  *Id.* at 203-04, 216, 260.  Mitchell went outside to speak with Bullock, who said he was there to pick up Petitioner.  *Id.* at 216-18, 284-85. Petitioner followed Mitchell outside a few moments later.  *Id*.  Petitioner and Bullock had a brief conversation and then all three got into the car.  *Id.* at 218-19.  Mitchell testified he got in the back passenger seat to go for a ride because he was bored.  *Id.* at 222.

As they drove away from Geno's, Petitioner, who was sitting in the front passenger seat, began giving Bullock directions to Petitioner's girlfriend's house.  *Id* at 221-23.  While they were

---

[1]Dale Shackleford, a bartender at Geno's, testified that the Tavern's clock runs fifteen minutes fast, which may have affected the time-lines provided by some witnesses, including Mitchell.  Docket No. 65, Attach. 40 at 614.

driving down Whitesboro Street, Petitioner told Bullock to slow down. *Id*. 223-24.  When Bullock slowed down to look at the houses, Petitioner shot Bullock in the right side of his head with a .22 caliber revolver. *Id*. at 224, 292-94.  Bullock grabbed his own head and said "Oh shit.  What the fuck." *Id*. at 224-25.  After being shot a second time, Bullock turned around in his seat and "jumped" back into Mitchell's lap, such that his lower body was still in the driver's seat but his upper body was in Mitchell's lap. *Id*. at 225-26.  Bullock "hugged" Mitchell's waist saying "Don't let him kill me." *Id*. at 225.  Mitchell struggled to get out from under Bullock's upper body while Petitioner turned around in his seat and continued to shoot Bullock. *Id*. at 226-28, 247, 298.  At some point Petitioner switched to a larger caliber pistol and continued firing. *Id*.  One of the shots from the second pistol struck Mitchell in the left calf. *Id*. at 230.

When Petitioner had finished shooting Bullock, he got out of the car and ran. *Id*. at 232. Mitchell saw Petitioner run into an alley and then back out in another direction. *Id*. at 232-33.  The car had crashed into a snow bank during the shooting. *Id*. at 234.  Mitchell managed to get out from under Bullock and forced the back passenger door open into the snow bank. *Id*. at 233-34.  Mitchell got out and ran in the opposite direction, eventually running into Sty. *Id*. at 235-36.  Sty and his girlfriend Stacy took Mitchell to a hospital in Rome, where Mitchell was treated for his gunshot wound. *Id*. at 239-40.

Mitchell initially told Stacy, the hospital staff, and the police that he was shot during an altercation with three men who tried to rob him. *Id*. at 239-41.  When it became apparent that the police did not believe the initial story, Mitchell told them he had accidently shot himself at home. *Id*. at 243-45.  He lied because he "didn't want nothing to do with it." *Id*. at 244.  However, once police began asking questions about Bullock's murder, Mitchell told them the story he eventually related at trial. *Id*. at 245-46.

Mitchell related his story to the grand jury the day following the murder. *Id*. at 250-52.  At that time he was unaware that transactional immunity applied and he did not have a deal with the prosecution. *Id*. at 250-51, 312-13.  A few days later Mitchell left Utica and returned to New York City. *Id*. at 250-52.  Over the next year, Mitchell was arrested and pled guilty to selling crack cocaine, possessing a firearm, and other drug related crimes. *Id*. at 253-57. When Mitchell was contacted by Oneida County prosecutors about testifying against Petitioner, he asked them to assist

him in making parole in exchange for his testimony. *Id*. at 258-59. He testified the prosecution had offered only to write the parole board a letter about his cooperation. *Id*.

Several other witnesses testified to events that night, roughly corroborating the time-line suggested by Mitchell's testimony.

Jamie Nimey was driving down Whitesboro Street around 10:15 or 10:30 p.m. when he saw a car bounce off a snow bank and come to a stop. *Id*. at 179-80. He saw the occupants of the vehicle struggling and heard several gunshots before he sped off to the nearest police station, where he encountered Officer White. *Id*. at 181-83. It was approximately 10:34 p.m. when Officer White got into his patrol vehicle to follow Nimey back to the scene and radioed dispatch. *Id*. at 149-50.

Latrisha Jackson, who was Bullock's girlfriend and a very good friend of Petitioner's testified reluctantly about the events of the evening. *See id*. at 535-62. Although she could not recall the time at trial, she told the grand jury that she and Bullock had begun preparing a late dinner around 9:00 p.m. *Id*. at 545-51. While they were preparing dinner, Petitioner and Bullock spoke by phone, sometime around 9:30. *See id*. at 548, 552-62. Bullock left Jackson approximately 20 minutes later to pick Petitioner up for dinner.[2] *Id*. at 556-62. Some time after Bullock left, Jackson received a phone call from Petitioner asking her where Bullock was. *Id*. at 564. At trial she was not really sure when that phone call came, but indicated she wanted to say it was only 15 minutes after Bullock left. *Id*. at 564. However, she affirmed her grand jury testimony that she told Petitioner over the phone that Bullock had left "a long time ago." *Id*. She also affirmed that, with dinner sitting uneaten on the table, she had watched some portion of the news and then gone to bed with her son and drifted to sleep before Petitioner's call came. *Id*. at 564-66.

John Sigbieny, the owner of Geno's Tavern, testified that he remembered Petitioner leaving the tavern around 10:00 or 10:15 p.m. *See id*. at 589-92. Sigbieny also remembered Petitioner coming back in to sit at the bar, but could not say whether Petitioner came or went after that because he was busy. *Id*. Dale Shackleford, a bartender at Geno's Tavern, testified that there were only

---

[2]Jackson was not sure where Bullock was picking up Petitioner, but she testified it takes approximately 10 minutes to drive to Geno's Tavern from her apartment. Docket No. 65, Attach. 40 at 556, 563. Jackson also suggested that her identification of precise times before the grand jury had been coached by police who were apparently trying to help her identify time markers, such as the nightly news, that would help her piece together a time-line. *See id*. at 558-59, 572-73.

three patrons in the tavern when he arrived at 10:25 p.m. for his shift, and that Petitioner was not one of them. *Id*. at 606-09. Shackleford, also testified that Petitioner entered the tavern with Randy Hutchinson at 11:00 p.m. according to the tavern clock, which was approximately 15 minutes fast. *Id*. at 609-14. Petitioner and Hutchinson positioned themselves at the end of the bar near the pay phone, but Shackleford could not see if Petitioner used the phone from his vantage point. *Id*. at 610.

Mitchell's testimony was also largely corroborated by the physical evidence introduced at trial. Having performed the autopsy, examined the car, and studied photographs of Bullock's body as it was found in the car and the wound to Mitchell's left leg, Dr. Barbara Wolf opined that all of the wounds were consistent with bullets having been fired from the front passenger seat. Docket No. 65, Attach. 41 at 137-51. Further, she opined that the forensic evidence was inconsistent with the gunshots having been fired from the rear passenger seat. *Id*. Her conclusions were based on the wound tracks and the absence of blood spatter on or bullet holes in the front passenger compartment. *Id*. Paul Kish, an independent forensic consultant, came to the same conclusions after analyzing all the evidence and reconstructing the scene. *Id*. at 30-71. Kish further opined that the blood stains on Mitchell's pants and the gunshot wound to his left calf were only consistent with Mitchell being seated in the rear passenger seat at the time of the shooting. *Id*.

Mitchell's testimony was also corroborated by the testimony of a jail-house informant, Lance Croman. Croman testified that he and Petitioner were assigned to the same housing block in the Oneida County Jail for two days in October 1996. Docket No. 65, Attach. 40 at 627-30. Croman had known Petitioner for about three years because Petitioner had been involved with one of Croman's ex-girlfriends. *Id*. at 619-21. On Petitioner's first night in the housing block, Petitioner told Croman that Petitioner and his partner had robbed crack cocaine from "some Domincan," Petitioner's partner had "got greedy," and that Petitioner had killed his partner and left him for dead in a car. *Id*. at 630. The only detail Petitioner told Croman about the murder was that he had used a .38 caliber pistol, and that he was upset when had to get rid of it after the murder because he had just bought it. *Id*. at 631. The next day, Petitioner told Croman he had not been truthful. *Id*. Croman's testimony was given in exchange for a deal to transfer his probation out of the state. *Id*. at

626.  He clearly testified that there was no deal regarding the burglary charges that were then pending against him.[3]  *Id.* at 624-26.

The defense rested without presenting evidence.  Docket No. 65, Attach. 41 at 205. Petitioner's counsel pointed to the holes in the evidence and argued during summation that the prosecution had failed to meet its burden.  Counsel suggested that Mitchell and Sty had killed Bullock.  He attacked the credibility of Mitchell and Croman.  He worked extensively with the time-line, and argued that Petitioner could not possibly have killed Bullock and gotten back to Geno's by 10:45 p.m. without running seven-minute miles.

The prosecution summarized the evidence, witness by witness.  She pointed out that Mitchell told his story to the grand jury within 24 hours of the incident, and argued that it was absurd to believe that a seventeen-year-old wannabe drug dealer with a tenth-grade education could craft a story that would eventually prove consistent with all the forensic evidence.  She emphasized how the evidence came together and argued there was no reasonable doubt.

On March 7, 1997, the jury found Petitioner guilty on all counts presented.

II - Post-trial

    *1.  Motion to Set Aside the Verdict Pursuant to C.P.L. § 330*

Petitioner, through counsel, filed a motion to set aside the verdict pursuant to C.P.L. § 330.30.  Docket No. 65, Attach. 3 (Ex. C).  He argued that the trial judge had erred by not submitting an accomplice-in-fact instruction to the jury and that the cumulative impact of the prosecutor's misconduct deprived him of a fair trial.  *Id.*  Specifically, he alleged the prosecutor engaged in misconduct by:  (1) improperly impeaching Sigbieny and Jackson with their grand jury testimony; (2) telling the jury that they would not receive an accomplice-in-fact instruction; (3) vouching for Mitchell and Croman's testimony; (4) suggesting an inference that Hutchinson had given Petitioner a ride on the night of the murder and that Mitchell and Croman were scared by

---

[3]An internal prosecution memorandum written on the eve of trial (hereinafter "the McNamara Memorandum") revealed the prosecution's assessment of the burglary case against Croman and its intent to allow Croman to plead to a petit larceny.  Docket No. 65, Attach. 26.  However, there is nothing in the record, except Petitioner's counsel's questions on cross examination, to suggest that either Croman or his attorney were privy to the prosecution's intent to eventually allow Croman to plead to a misdemeanor larceny.  *See* Docket No. 65, Attach 40 at 634-60.

Hutchinson's presence in the courtroom; and (5) comparing defense counsel's compensation to the compensation paid to the state's expert witnesses. *Id*. The motion was denied in an oral decision on April 21, 1997. Docket No. 65, Attach. 40 at 71-87.

### 2. First Motion to Vacate the Judgment Pursuant to § 440

On December 3, 1997, Petitioner filed a pro se motion to vacate the judgment pursuant to C.P.L. § 440.10. Docket No. 65, Attach 6 (Ex. F). Petitioner claimed that: (1) he had newly-discovered evidence to support his innocence; and (2) the prosecution violated *Brady v. Maryland*, 378 U.S. 83 (1963), by failing to disclose that Mitchell had slashed another inmate with a knife while he was in prison. *Id*. The newly-discovered evidence consisted of three affidavits of individuals, including Petitioner, claiming that Mitchell had personally confessed to them that he killed Bullock.

The state court initially refused to consider the motion because Petitioner had not filed the original affidavits, and one of the affidavits was not properly sworn. Docket No. 65, Attach. 10 (Ex. J). The state court subsequently denied the motion on the merits on the basis of an affidavit sworn by Mitchell denying that the allegations contained in the affidavits presented by Petitioner. Docket No. 65, Attach. 11 (Ex. K). As to the *Brady* claim, the Court credited the statement of the prosecutor that she was not aware of the prison disciplinary action and ruled that the prosecution had no obligation to seek disciplinary records from the prison system. *Id*. Further, the court found that the failure to disclose the disciplinary record did not affect the verdict as Mitchell's criminal history was fully explored at trial. *Id*.

/////

/////

### 3. Direct Appeal

Petitioner, through appellate counsel, filed an appellate brief with the New York State Appellate Division, Third Department. Docket No. 65, Attach. 12 (Ex. L). He argued reversal was warranted because: (1) the trial court had wrongly denied the accomplice-in-fact instruction; (2) the trial court had wrongly excluded Jackson's testimony about what Bullock had said regarding his criminal enterprises; (3) he was denied a fair trial by the cumulative impact of the prosecutor's misconduct; and (4) that his sentence was excessive. *Id*.

The Appellate Division unanimously affirmed Petitioner's conviction and sentence. *People v. Young*, 277 A.D.2d 910 (N.Y. App. Div. 2000) (found in the record at Docket No. 65, Attach 14 (Ex. N)).  The court first concluded that there was no basis for the trial court to submit an accomplice-in-fact instruction, finding that "[t]here was no evidence presented from which the jury could reasonably infer that the witness participated in the offenses." *Id*.  The court affirmed the decision to exclude Jackson's testimony as there is no right to submit proof that merely raises a suspicion that another committed the crime. *Id*.  The court found that the prosecutorial misconduct was not so egregious as to deny Petitioner a fair trial. *Id*.

Petitioner applied for leave to appeal in the New York Court of Appeals, Docket No. 65, Attach. 15 (Ex. O), which was denied on May 23, 2001, *People v. Young*, 96 N.Y.2d 836 (2001) (found in the record at Docket No. 65, Attach. 16 (Ex. P)).

### 4. Original Federal Application for Habeas Corpus

Petitioner next filed an application for habeas corpus in the federal district court.  Docket No. 1.  The application, filed on August 22, 2002, was dated August 18, 2002. *Id*. at 6.  Four grounds for relief were raised:  (1) the trial court erred by denying an accomplice-in-fact instruction; (2) the trial court had wrongly excluded Jackson's testimony about what Bullock had said regarding his criminal enterprises; (3) he was denied a fair trial by the cumulative impact of the prosecutor's misconduct; and (4) the prosecution's use of perjured testimony, as evidenced by reports prepared by the Federal Bureau of Investigation ("FBI") following interviews with Mitchell in April and October 1997, violated Petitioner's due process rights. *Id*. at 8-9.  The district court stayed the action to allow Petitioner to exhaust his state remedies by way of a second § 440 motion filed on February 5, 2003.  Docket Nos. 13 (Order staying proceedings); 65, Attach. 17 (Ex. Q).

### 5. Second Motion to Vacate the Judgment Pursuant to § 440

Petitioner's second § 440 motion related to the claim that the prosecution had offered perjured testimony.  In support of the motion, Petitioner filed interview reports prepared by the FBI for its post-trial interviews of Mitchell in April and October 1997. *See* Docket No. 65, Attachs. 18 (Ex. R) and 19 (Ex. S).  The FBI reports make clear that Mitchell knew more about Randy Hutchinson and the Utica drug operation than he admitted at trial.  Mitchell told the agents that:

8

(1) Sty had recruited him for Hutchinson's drug operation; (2) Hutchinson sent Bullock and maybe Petitioner to rob a Dominican drug spot; (3) Hutchinson was present during the argument between Bullock and Petitioner on January 15, 1996; (4) Hutchinson ordered Petitioner, who was the "enforcer" for the organization, to kill Bullock; and (5) Hutchinson and Petitioner tried to kill him (Mitchell) about a month after he testified before the grand jury. *Id*. Petitioner argued that the prosecutor violated his due process by using Mitchell's "perjured" testimony. Docket No. 65, Attach. 17 (Ex. Q). He also argued the FBI reports constituted newly discovered evidence that would change the result if a new trial were held, entitling him under New York law to a new trial. *Id*. at 18.

The state court denied the motion because the prosecutorial misconduct claim had been denied on the merits in his direct appeal, and there was sufficient information in the record to have brought his other claims at that time. Docket No. 65, Attach. 21 (Ex. U). On July 2, 2004, the Appellate Division denied Petitioner leave to appeal. Docket No. 65, Attach. 24 (Ex. X).

### 6. *Third Motion to Vacate the Judgment Pursuant to § 440*

On July 28, 2004, while the habeas petition in this Court remained stayed, Petitioner filed his third pro se motion to vacate the judgment pursuant to C.P.L. § 440. Docket No. 65, Attach 25 (Ex. Y). He asserted that the prosecutor knowingly used perjured testimony when Lance Croman testified that the only deal he received for his testimony was the transfer of his probation and that there was no deal related to his pending burglary charges. *Id*. at 4-5. In support, Petitioner submitted an internal memorandum issued on the eve of Petitioner 's trial from ADA Scott McNamara to the prosecutor in Petitioner's case ("the McNamara Memorandum"), which gave a frank assessment of the case against Croman and stated that in exchange for Croman's full cooperation and waiver of his speedy trial rights, the office had agreed to: (1) delay indicting Croman on the burglary charge; and (2) attempt to have Croman's probation either transferred or terminated if he made total restitution. Docket No. 65, Attach. 26 (Ex. Z). The memorandum further outlined the prosecution's intent, not disclosed to Croman, to allow Croman to plead to a petit larceny instead of a burglary. *Id*. Petitioner argued that his due process rights were violated by the knowing use of Croman's perjured testimony, further compounded by the prosecutor's reliance on the perjured testimony during her summation. Docket No. 65, Attach. 25 (Ex. Y). In his reply

9

brief, Petitioner also alleged his trial counsel rendered ineffective assistance because he possessed the memorandum at trial and failed to expose Croman's perjury. Docket No. 65, Attach. 28 (Ex. BB).

On August 18, 2004, the state court denied the motion. Docket No. 65, Attach. 29 (Ex. CC). As to the prosecutor's summation, the court noted that the issue of prosecutorial misconduct had been reviewed on the merits within Petitioner's direct appeal and concluded that Petitioner's prosecutorial misconduct claim was barred from further review. *Id*. at 5-6. The court further found that the McNamara Memorandum revealed that Croman did not perjure himself, as the memo itself makes clear that Croman had not been informed of the prosecution's intent to settle for a petit larceny. *Id*. at 5. Finally, the court concluded that the remainder of Petitioner's claims were barred because there were sufficient facts on record at the time of Petitioner's direct appeal for Petitioner to raise his perjury and ineffective assistance claims, and he unjustifiably failed to do so. *Id*. at 6. Petitioner's application for leave to appeal to the Appellate Division was denied on November 3, 2005.

### 7. *Fourth Motion to Vacate the Judgment Pursuant to § 440*

Petitioner filed an amended application in his federal habeas case in March 2006. This was stricken from the record two months later, and the federal case was again stayed to allow Petitioner to exhaust his claims by way of a fourth § 440 motion, filed March 20, 2006. Docket Nos. 38, 40. The fourth motion to vacate alleged the prosecutor had violated *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to disclose a Rome police report drafted by Detective Netzband that summarized Mitchell's interview on the night of the murder. Docket No. 65, Attach. 33 at 4 (Ex. GG). The report indicated that law enforcement had agreed with ADA McNamara that Mitchell would be released to the Utica Police without being charged for his initial false police report ("the Rome police report). *Id*. Petitioner next claimed that the prosecutor knowingly relied upon false or misleading testimony regarding this separate consideration that Mitchell allegedly received in exchange for his testimony. *Id*. Finally, Petitioner claimed that the prosecutor falsely argued in summation that Mitchell received no consideration other than the District Attorney's parole board letter. *Id*.

On June 13, 2006, the state court denied Petitioner's motion, concluding that Petitioner's claims were barred because the issue of prosecutorial misconduct on summation had been reviewed on Petitioner's direct appeal, and the other issues raised by his claims had been stated and denied in Petitioner's previous § 440 motions.  Docket No. 65, Attach. 36 (Ex. JJ).  Petitioner's application for leave to appeal to the Appellate Division was denied on July 27, 2007.  Docket No. 65, Attach. 39 (Ex. MM).

8. *Amended Federal Application for Habeas Corpus*

After Petitioner exhausted his Fourth § 440 motion, the stay was lifted in this case and Petitioner filed an amended petition.  Docket No. 55.  The amended petition, allegedly signed on August 24, 2007, was filed with the Court on February 4, 2008.  *Id.*  The amended petition sets forth the following claims:  (1) the prosecution violated Petitioner's right to due process under *Brady* and *Giglio* when it failed to disclose evidence allegedly establishing that (a) based on the FBI reports, Mitchell lied about the extent of his association with Petitioner and Hutchinson, as well as Hutchinson's role in Bullock's murder; (b) based on the McNamara Memorandum, Croman lied about his deal with the prosecution; and (c) based on the Rome police report, Mitchell lied about the his deal with the prosecution to avoid a charge of filing a false police report; (2) on the basis of the same evidence, the prosecutor knowingly relied on and did not correct Mitchell's and Croman's perjured testimony; (3) the state court violated Petitioner's right to due process when it rejected Petitioner's first § 440 motion on the basis that it was not supported by original sworn affidavits; (4) the cumulative impact of the prosecutor's summation violated Petitioner's right to due process; and (5) Petitioner was deprived of his right to effective assistance of counsel when his trial attorney failed to challenge Croman's testimony about the absence of a deal on the burglary charge.  Docket No. 55.  Respondent has filed an Answer raising procedural defenses and arguing that Petitioner's claims fail on the merits.  Docket Nos. 64 (Answer), 66 (Mem.).  Petitioner has filed a Traverse. Docket No. 69.

## LEGAL STANDARD

The standard of review employed by a district court in reviewing the state court judgment depends on whether the claims were "adjudicated on the merits."  *See* 28 U.S.C. § 2254(d).  If the state court has adjudicated the federal claims on the merits," then the deferential standard under the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *Id.*; *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001). A decision is adjudicated "on the merits" when it finally resolves the claim, with res judicata effect, based on substantive rather than procedural grounds. *Id.* at 311-12. This is so, "even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Id.* at 312.

Where a federal claim was adjudicated on the merits, AEDPA mandates that a writ of habeas corpus shall not be granted unless the state adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"In reviewing habeas petitions, we must presume the state court's findings of fact are correct, unless the petitioner meets the 'burden of rebutting this presumption of correctness by clear and convincing evidence.'" *Lanfranco v. Murray*, 313 F.3d 112, 117 (2d Cir. 2002) (quoting 28 U.S.C. § 2254(e)(1)). The presumption of correctness applies to findings by both state trial and appellate courts. *Whitaker v. Meachum*, 123 F.3d 714, 715 n.1 (2d Cir. 1997).

A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision involves an unreasonable application of Supreme Court case law if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id.*

Under AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited

12

to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

However, if there is no adjudication on the merits then the pre-AEDPA de novo standard applies. *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003).

## DISCUSSION

I - <u>Abandonment</u>

Respondent argues that Petitioner abandoned two grounds for relief asserted in his original petition and not reasserted in the amended petition. Docket No. 66 at 33. Specifically, Respondent alleges Petitioner has abandoned the following grounds: (1) the trial court erred by denying an accomplice-in-fact instruction; (2) the trial court erred by wrongly excluding Jackson's testimony about what Bullock had said regarding his criminal enterprises. *Id*. Petitioner addressed these grounds for relief in neither his amended petition nor his traverse. *See* Docket Nos. 15, 69.

An amended pleading supersedes the original, such that "the original pleading no longer performs any function in the case." *Laza v. Reish*, 84 F.3d 578, 581 (2d Cir. 1996). Although the Court would be willing to overlook a mistake by a pro se litigant in this sort of situation, Petitioner's silence on this subject in his well-written traverse makes it apparent that the omission of these claims was intentional. The Court therefore deems them abandoned, and will consider only the claims asserted in the amended petition.

II - <u>Statute of Limitations</u>

Respondent acknowledges that Petitioner's original petition was timely, but argues that most of the claims in the amended petition have not been timely raised. Specifically, Respondent argues that all the claims, with the exception of Petitioner's claim regarding Mitchell's perjury and the prosecutor's misconduct during summation, were filed after the statute of limitations had run and do not relate back to the claims stated in the original petition. Docket No. 66 at 33. Petitioner has not contested the Respondent's position that most of the amended claims do not relate back to the original petition. However, Petitioner argues that: (1) the Respondent waived the statute of limitations defense by failing to oppose Petitioner's motion to file an amended complaint; (2) the amended perjury claims were timely, having been filed within one year of the date he discovered them; (3) the amended perjury claims were timely, having been filed within one year of the date a

13

government impediment was removed; and (4) the Respondent should be estopped from raising the statute of limitations as a defense to his perjury claims because he was entitled to rely on the testimony of the prosecution's witnesses.  Docket No. 69 at 11-22.

### 1. Waiver

Petitioner argues Respondent waived the statute of limitations defense by failing to oppose Petitioner's motion to file an amended complaint.  Docket No. 69 at 18-22.  While Respondent did not file an opposition to the motion to amend, Respondent included its statute of limitation defense in its response to the amended pleading.

The limitations period imposed by 28 U.S.C. 2244(d) is a statute of limitations, not a jurisdictional bar to suit.  *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000).  As such, it may be waived.  *Grate v. Stinson*, 224 F. Supp. 2d 496, 498 n.3 (S.D. N.Y. 2002).  When responding to a pleading, Federal Rule of Civil Procedure 8 requires a party to affirmatively state affirmative defenses.  Fed. R. Civ. P. 8(c)(1).  Although Respondent could have raised the timeliness issue in an opposition to Petitioner's motion to amend, it was not required to do so under Rule 8 until it responded to the amended petition.  The Court will not deem the defense waived.

### 2. Timeliness

A state petitioner seeking a writ of habeas corpus must apply within one year of:  "(A) the date on which the judgment became final . . ; (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws the United States is removed . . ; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court . . ; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1).

In this case, Petitioner was denied leave to appeal his conviction to the New York State Court of Appeals on May 23, 2001.  *People v. Young*, 96 N.Y.2d 836 (2001) (found in the record at Docket No. 65, Attach. 16 (Ex. P)).  The judgment became final 90 days later on August 21, 2001, giving Petitioner until August 21, 2002, to apply for habeas relief.  *See Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).  When Petitioner filed the original petition, dated August 18, 2002, he had only three days remaining.  *See* Docket No. 1 at 6.  As the federal petition does not toll the period of

14

limitations, the time to file expired on August 21, 2002.  *See Duncan v. Walker*, 533 U.S. 167, 181-82 (2001).  The amended petition, filed February 4, 2008, clearly missed the deadline. Consequently, in order for Petitioner's amended claims to proceed, they must either relate back to the date of the original petition, or have been filed within one year of one of the other dates identified by 28 U.S.C. § 2244(d)(1).

Petitioner argues that his amended perjury claims related to the deals given to Croman and Mitchell are independently timely under 28 U.S.C. §§ 2244(d)(1)(B) and (D) and that the Respondent should be estopped from invoking the statute of limitations because the prosecution prevented Petitioner from discovery of the factual basis of these perjury claims.  These three arguments collapse together as Petitioner essentially contends that a Government impediment, the prosecution's alleged use of perjured testimony at trial, prevented him from discovering the factual predicate of his perjured testimony claims until well after the judgment became final.  Petitioner's arguments are unavailing.

### A. McNamara Report

Petitioner alleges the prosecution knowingly used perjured testimony when it failed to correct Croman's testimony that he did not testify in exchange for a deal on his pending burglary charge.  He argues that he did not know Croman had perjured himself until he received a copy of the McNamara Memorandum on June 27, 2004.  Docket No. 69 at 13.  Counting on statutory tolling pursuant to 28 U.S.C. § 2244(d)(2) from July 28, 2004 through November 3, 2005, and March 20 2006, through July 27, 2007, for his third and fourth § 440 motions respectively, Petitioner submits he timely filed his claim on August 24, 2007.  Docket No. 69 at 12.  Petitioner overlooks the gaps between the initial denial of his § 440 motions and his applications for leave to appeal those denials.

Section 2244(d)(2), by its express language, excludes from the limitation period "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  The proceeding continues to be "pending" until such time as it is finally determined and further appellate review is unavailable under applicable state procedures.  *Hizbullahankhamon v. Walker*, 255 F.3d 65, 70 (2d Cir. 2001), citing

15

*Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999).  However, the gap between a lower court's denial of an application for State post-conviction relief and a petitioner's appeal of that decision is tolled only if timely.  *See Evans v. Chavis*, 546 U.S. 189, 191 (2006) (citing *Carey v. Saffold*, 536 U.S. 214 (2002)).  Under New York law, a motion for leave to appeal the denial of a § 440.10 motion must be filed within 30 days of service of the order.  *See* N.Y. Crim. Proc. Law §§ 460.10(4), 460.15; *See also Bennett v. Artuz, supra*.

Petitioner's claim of timeliness for the Croman perjury claim is predicated on the Court tolling an eight-month gap between the August 18, 2004, denial of Petitioner's third § 440.10 motion and his appeal of that denial on April 18, 2005.  *See* Docket No. 65, Exs. CC and DD.  As this unexplained gap is well beyond the 30 days recognized under New York law and the six months deemed unreasonable in *Evans*, this gap will not be tolled.  Petitioner's claim of timeliness also relies on the Court tolling a five-month gaps between the June 13, 2006, denial of his fourth § 440.10 motion and his appeal of that denial on November 20, 2006.  *See* Docket No. 65, Exs. JJ and KK.  Again, as this unexplained gap is untimely under New York law, it will not be tolled.  Each of these gaps is sufficient to run out the 130 days Petitioner argues remained for him to file his petition.  Thus, even if the Court were to accept that Petitioner could not have discovered the factual predicate at an earlier date with due diligence, which it does not, the amended claim was still untimely.

### B. Rome Police Report

Petitioner alleges the prosecution knowingly used perjured testimony when it failed to correct Mitchell's testimony that he had not avoided a charge of filing a false police report in exchange for his testimony.  Petitioner claims to have discovered the Rome police report on April 1, 2006, through a Freedom of Information Act request.  Docket No. 69 at 14.  This is clearly untrue.  First, in an earlier filing with this Court, Petitioner claimed to have obtained the Rome Police report on March 15, 2006.  Docket No. 38 at 2l.  Second, as Petitioner had analyzed the report, done his legal research, written his fourth § 440 motion, which covers the Rome police report, and submitted it for filing on March 20, 2006, the Court believes Petitioner had possession of it at an even earlier date.  Docket No. 65, Ex. GG.  However, the Court will assume for the sake of argument that Petitioner did not discover the report until April 1, 2006.  .

16

The relevant question is when the facts could have been discovered through due diligence, "regardless of whether petitioner actually discovers the relevant facts at a later date." *Adams v. Greiner*, 272 F. Supp.2d 269, 273-74 (S.D.N.Y. 2003) (quoting *Wims v. United States*, 225 F.3d 186, 188 (2d Cir. 2000)).  Moreover, it is the Petitioner's "burden to demonstrate why he was unable to discover the factual predicate of his claim before the date asserted." *Yekimoff v. N.Y. State Div. of Parole*, No. 02 Civ. 8710(BSJ), 2004 WL 1542256, at *5 (S.D.N.Y. July 8, 2004) (citing *Duamutef v. Mazzuca*, No. 01 Civ. 2553 (WHP)(GWG), 2002 WL 413812, at *8-9 (S.D.N.Y. Mar. 15, 2002), and *Sorce v. Artuz*, 73 F. Supp. 2d 292, 298 (S.D.N.Y.1999)).

It is readily apparent from the transcript of trial that the Rome police report was in the defense's possession during the trial.  *See* Docket No. 65, Attach. 40 at 288 (Petitioner's trial counsel quotes from the report during cross examination of Mitchell).  It was also clear from Mitchell's testimony that he had filed a false report with the Rome police and had been turned over to the Utica police.  *Id*. at 241-45, 250.  The relevant facts were thus available to Petitioner at least by February 1997, and therefore could have been discovered by the exercise of due diligence roughly nine years before Petitioner claims to have discovered the report.

The period of limitations began to run for all of Petitioner's claims on the date his judgment became final.  While the original petition was timely, the amended petition was filed after the period of limitations had run.  Consequently, for any of Petitioner's amended claims to be deemed timely, they must relate back to the original petition.

### 3. Relation Back

For the claims made in the amended petition (hereinafter "amended claims") to relate back to the original petition, the amended claim must assert "a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B). The Supreme Court has clarified that this requires the amended claims to have more in common with the original claims than the mere fact they arose out of the same stage of the criminal proceedings, rather, "the original and amended petitions state claims that are tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005).  An amended claim does not relate back to the original petition if it is based on facts that are different in time and type from those set forth in the original pleading.  *See id.* at 657.  "In determining whether the claim arises out of the

17

same conduct or occurrence, 'the pertinent inquiry . . . is whether the original complaint gave the defendant fair notice of the newly alleged claims.'" *Fama v Comm'r. of Correctional Servs.*, 235 F.3d 804, 815 (2d Cir. 2000) (quoting *Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 (2d Cir. 1998)).

The original petition raised four grounds for relief:  (1) the trial court erred by denying an accomplice-in-fact instruction; (2) the trial court had wrongly excluded Jackson's testimony about what Bullock had said regarding his criminal enterprises; (3) he was denied a fair trial by the cumulative impact of the prosecutor's misconduct; and (4) the prosecution's use of perjured testimony, as evidenced by reports prepared by the Federal Bureau of Investigation ("FBI") following interviews with Mitchell in April and October 1997, violated Petitioner's due process rights.  *Id*. at 8-9.  The amended petition raises five grounds for relief:  (1) the prosecution violated Petitioner's right to due process under *Brady* and *Giglio* when it failed to disclose evidence allegedly establishing that (a) based on the FBI reports, Mitchell lied about the extent of his association with Petitioner and Hutchinson; (b) based on the McNamara Memorandum, Croman lied about his deal with the prosecution; and (c) based on the Rome police report, Mitchell lied about the his deal with the prosecution to avoid a charge of filing a false police report; (2) on the basis of the same evidence, the prosecutor knowingly relied on and did not correct Mitchell's and Croman's perjured testimony; (3) the state court violated Petitioner's right to due process when it rejected Petitioner's first § 440 motion on the basis that it was not supported by original sworn affidavits; (4) the cumulative impact of the prosecutor's summation violated Petitioner's right to due process; and (5) Petitioner was deprived of his right to effective assistance of counsel when his trial attorney failed to challenge Croman's testimony about the absence of a deal on the burglary charge.  Docket No. 55.

### A.  Brady/Giglio Error

Respondent submits that Petitioner's three *Brady/Giglio* claims do not relate back to the original petition.  As there is no mention in the original petition of either Croman's deal with prosecution or Mitchell's deal regarding the Rome police report, neither of the amended claims pertaining to theses incidents relate back.  Petitioner's amended claim regarding the FBI interview notes is a closer case because Petitioner alleged in the original petition that the FBI interview notes

demonstrated that the prosecution knowingly used Mitchell's perjured testimony.  Docket No. 1 at 9.  The original petition however contained no facts indicating that the FBI's post-trial reports were not properly discovered.  As the amended claim regarding the FBI's notes does not arise out of the facts pled in the original petition, it too fails to relate back.  *See Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006).

### B.  Knowing Use of Perjury

As conceded by Respondent, Petitioner's amended claim alleging that the FBI's interview notes demonstrate that the prosecution knowingly used Mitchell's perjured testimony is an amplification of the original claim.  Docket No. 33.  The Court accordingly deems this claim timely.  However, as there is no mention of either Croman's deal with the prosecution or Mitchell's deal regarding the Rome police report in the original petition, neither of these claims relate back.

### C.  Rejection of Second § 440 Motion for Want of Affidavits

There is nothing in the original petition regarding the rejection of his second § 440 motion.  Consequently, his amended claim concerning that issue fails to relate back.  Further, the Court notes that this claim is moot in light of the fact that the county court later addressed and rejected Petitioner's contentions on the merits.

### D.  Prosecutorial Misconduct

As conceded by Respondent, Petitioner's amended claim of prosecutorial misconduct merely amplifies the allegations in the original third claim.  The Court accordingly deems Petitioner's prosecutorial misconduct claim as timely.

### E.  Ineffective Assistance of Trial Counsel

Petitioner's amended petition contains a claim alleging his trial counsel was ineffective when he failed to get Croman to admit he had received a deal on his burglary case.  As there is nothing in the original petition even alluding to Croman's perjury or his counsel's ineffective assistance, this claim fails to relate back.

In summary, only two of the claims in the amended petition relate back to the original: (1) the prosecution's alleged knowing use of Mitchell's perjured testimony as contradicted by the FBI's interview notes; and (2) the prosecution's alleged vouching and other illegal argument during

19

summation.  These are the only claims presented in the amended petition that are timely.  All of the other claims are barred by the statute of limitations.

III - Exhaustion

The Court declines to address Respondent's procedural bar arguments and will instead address Petitioner's remaining claims on the merits.  *See* 28 U.S.C. 2254(b)(2).

IV - Merits

*1.  Knowing use of Mitchell's perjury regarding his relationship with Hutchinson*

Petitioner contends that the prosecution knowingly offered or failed to correct perjured testimony when Mitchell testified that he knew Randy Hutchinson and Petitioner only socially from Geno's Tavern.   In support of the motion, Petitioner relies on reports prepared by the FBI from its post-trial interviews of Mitchell in April and October 1997.  *See* Docket No. 65, Attachs. 18 (Ex. R) and 19 (Ex. S).  The FBI reports make clear that Mitchell knew more about Randy Hutchinson and the Utica drug operation than he admitted at trial.  Mitchell told the agents that:  (1) Sty had recruited him for Hutchinson's drug operation; (2) Hutchinson sent Bullock and maybe Petitioner to rob a Dominican drug spot; (3) Hutchinson was present during the argument between Bullock and Petitioner on January 15, 1996; (4) Hutchinson ordered Petitioner, who was the "enforcer" for the organization, to kill Bullock; and (5) Hutchinson and Petitioner tried to kill him (Mitchell) about a month after he testified before the grand jury.  *Id*.  Petitioner argues that the prosecutor violated his due process by using Mitchell's "perjured" testimony.

"First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  *Id*.  These principles do "not cease to apply merely because the false testimony goes only to the credibility of the witness."  *Id*.   However, the false testimony must still qualify as "material" under *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  *Jenkins v. Artuz*, 294 F.3d 284, 292 (2d Cir. 2002) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  An error does not require a new trial unless "'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'"  *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).  Such a reasonable likelihood exists when the probability that the result

would have been different is "'sufficient to undermine confidence in the outcome.'" *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987)).

In this case, Petitioner has never articulated how the prosecution had either actual or constructive knowledge of Mitchell's perjury at the time of the trial. The FBI interviews were conducted after the conclusion of Petitioner's trial. Petitioner seems to have simply assumed that the prosecution knew the whole story and knowingly allowed or even encouraged Mitchell to downplay his relationship with Petitioner and Hutchinson. Other than Petitioner's bald allegation, there is nothing in the record that suggests the prosecution knew or should have known that Mitchell lied about these relationships. Without such knowledge, there is no violation under *Napue*. *See Napue*, 360 U.S. at 269.

Further, there is no reasonable likelihood that the false testimony in question would have affected the judgment of the jury. The only apparent perjury revealed by the FBI interviews was Mitchell's testimony that his relationship with Petitioner and Hutchinson was merely social. The Court is confident the outcome of the trial would have remained the same given how all the testimonial and forensic evidence corroborated Mitchell's testimony. As the prosecutor suggested in her closing argument, it is highly unlikely that Mitchell, a seventeen-year-old highschool dropout, could have invented an untruthful story within a few hours of the incident that would match the abundant physical evidence presented in this case.[4] The gunshot wound to Mitchell's leg placed him in the backseat of the car, while the blood spatter, ballistics and pathology placed the shooter in the front passenger seat. Jackson's testimony that Bullock had left her to pick up Petitioner shortly before the shooting strongly infers that Petitioner was the person sitting in the front passenger seat. Croman's testimony that Petitioner had confessed to the murder would seem to confirm it.

Nor is this a case, like *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988), where a credible recantation by a witness requires further due process. Habeas relief on a claim based on perjury in the absence of prosecutorial knowledge is warranted "only . . . in the most extraordinary circumstances." *Id*. at 225 (internal quotation marks omitted). To satisfy this exacting standard, the

---

[4]This inference is strongly reinforced by Mitchell's two pathetic attempts to lie to the Rome police about the origin of the gunshot wound to his calf.

Petitioner would have to show that:  (1) a witness against him had recanted his testimony; (2) the recantation was reliable; and (3) the elimination of the perjured testimony was material and "would 'probably' cause a result of acquittal upon retrial." *Id*.  The false testimony at issue here would not have affected the jury and would not cause a result of acquittal should a retrial be held.  Petitioner's claim accordingly fails.

/////

/////


   2. *Prosecutor's vouching and other misconduct during summation*

   Petitioner argues the cumulative impact of the prosecution's misconduct during summation violated his right to due process.  Docket No. 55, Attach. 1 at 44.  Specifically, he complains that the prosecution:  (1) vouched for Croman and Mitchell's credibility; (2) endorsed Mitchell's account of the argument preceding the shooting; (3) "lied" that the transfer of probation Croman received was for safety reasons; (4) argued Croman and Jackson were afraid to testify truthfully at times because of the presence of Hutchinson in the Courtroom; (5) told the jury they would not receive an accomplice instruction regarding Mitchell from the judge; (6) suggested Petitioner was able to return to Geno's so quickly after the murder because Hutchinson gave him a ride.  *Id*. at 44-45.  The Appellate Division denied Petitioner's misconduct claim, finding that "[t]he claimed instances of prosecutorial misconduct were not so egregious that [Petitioner] was deprived of a fair trial."  *People v. Young*, 277 A.D.2d 910 (N.Y. App. Div. 2000) (available at Docket No. 65, Ex. N).  Respondent argues the Appellate Division's decision was not contrary to or an unreasonable application of federal law.  Docket No. 66 at 48-54.

   Prosecutors have a special duty as the representative of the State:  "He may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).  "It is well established that prosecutors may not vouch for their witnesses' truthfulness." *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) (internal quotation marks omitted).  Vouching is problematic both because it lends the prestige of the prosecutor's office to the witness and because the jury may assume the

prosecutor's comments are based on facts not presented to the jury.  *See United States v. Modica*, 663 F.2d 1173, 1178-79 (2d Cir. 1981).

A writ of habeas corpus will not issue for prosecutorial misconduct unless the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)); *see also Carr*, 424 F.3d at 227.  "In order to be entitled to habeas relief, [a petitioner] must demonstrate that he suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict."  *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 636 (1993)).  The *Brecht* actual prejudice standard of review continues to apply post-AEDPA.  *Fry v. Pliler*, 127 S. Ct. 2321, 2326-27 (2007).  In determining whether such prejudice exists, a district court examines the totality of the circumstances, including "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct."  *Bentley*, 41 F.3d at 824-25.

### A. Comments regarding Mitchell

Petitioner's claim regarding Mitchell references three pieces of the prosecution's summation.  First, Petitioner submits that the prosecution vouched for Mitchell.  Docket No. 55, Attach. 1 at 16, 44.  As Petitioner failed to point the Court to the record, the Court assumes Petitioner was referencing the prosecutor's discussion of the deal given to Mitchell, ending with the comment, "[a]nd after all, ladies and gentlemen, that's the truth."  Docket No. 65, Attach. 41 at 308.  While this comment was certainly inappropriate, it was a fleeting comment that was immediately corrected by the court:  "Sustained.  Please don't vouch for the credibility of witnesses.  That's up for the jury to decide."  *Id*. at 309.

Second, Petitioner argues the prosecutor "endorsed" Mitchell's version of the argument between Petitioner and Bullock that preceded the shooting.  *See* Docket No. 55, Attach. 1 at 15-16, 44.  The sections of the summation cited by Petitioner show only the prosecutor's rehash of Mitchell's testimony and legitimate forms of argument.  *See* Docket No. 65, Attach. 41 at 265-69, 277-78.  The prosecution is not precluded from vigorously arguing the version of facts and

23

inferences established by the evidence presented.  *See United States v. Rivera*, 971 F.2d 876, 884

(2d Cir. 1992).  As the prosecutor did not inject her personal opinion, it was permissible argument.

Third, Petitioner argues it was inappropriate for the prosecutor to bolster Mitchell's

credibility by the telling the jury that the court would not be giving them an accomplice instruction.

Docket No. 44, Attach. 1 at 45.  The prosecutor was responding to defense counsel's argument that

Mitchell was the shooter:

> Ladies and gentleman, he tried as hard as he could to make [Mitchell] a shooter, two
> shooters, but there was no evidence that [Mitchell] was involved in this crime in any
> way, shape or form, none, zero, other than his speculation and him trying to put words
> in [Mitchell's] mouth.  You told your friend this in New York, you told you did a
> favor for your man.  Those were his words, ladies and gentlemen.  And you listen to
> the Judge's charges, and he'll tell you that what he says and what I say is not
> evidence.  And that's the only suggestion there was of anything that [Mitchell] was.
> And then I want you to do something else.  You listen carefully when the Judge reads
> the charges, and you listen to see if you hear anything about accomplice.  But I submit
> to you, ladies and gentlemen, there is no accomplice charge going to be coming from
> Judge Donalty in this case.

Docket No. 65, Attach. 41 at 306-07.  While it was clearly inappropriate for counsel to attempt to

enlist the court in bolstering Mitchell's credibility, the comment here was *de minimis* for several

reasons.  First, the comment was immediately objected to and sustained.  *Id*. at 307.  Second, the

Court instructed the jury both before and after that counsel's arguments were not evidence.  Third,

the inference the prosecutor was trying to suggest would have taken a fairly informed understanding

of the role of a court's instructions and that of an accomplish instruction specifically.  Fourth, the

court specifically admonished that the jury should carefully scrutinize Mitchell's testimony in light

of criminal convictions, grand jury immunity and his deal with the prosecution.  *Id*. at 327-29.

### B. Comments regarding Croman

Petitioner's claim regarding Croman argues the prosecution:  vouched for Croman's

credibility; "lied" that the probation transfer was for safety reasons; and argued Croman's demeanor

during his testimony was a result of his fear of Randy Hutchinson who was present in the

courtroom.  Docket No. 55, Attach. 1 at 16, 44-45.  All of these claims focus apparently on one

short segment of the prosecutor's summation:

> And yes, we offer[ed] him something to come here before you.  Yeah, we did.  We
> told him that we would try to get his probation transferred so he could get out of
> town.  And I'll leave it up for you to decide why that kid wants to get out of town.
> And you observe why he was looking straight ahead.  Do you think he wanted to look
> out into the audience so he could get eyeballed and intimidated?

24

Docket No. 65, Attach. 41 at 304.

It was inappropriate for the prosecutor to vouch for the deal made with Croman.  However, as with the missteps made regarding Mitchell, the misconduct was *de minimis*.  The court admonished the jury both before and after the summations that the argument was not evidence. Second, the prosecution is given some leniency, where as here, the defense has repeatedly attacked the credibility of the government's witnesses.  *See United States v. Thai*, 29 F.3d 785, 807 (2d Cir. 1994).  The prosecutor's comments regarding Croman's transfer were not inappropriate as they made clear it was up to the jury to decide why Croman wanted the transfer.  Finally, the explanation of Croman's demeanor, following comments by the defense attorney about that demeanor, were entirely appropriate.  *See Rivera,* 971 F.2d at 885.

### C. Comments regarding Jackson

Petitioner contends it was inappropriate for the prosecution to suggest that Jackson's lapses of memory were possibly because she was afraid of Hutchinson, who was in the courtroom when she testified.  As noted *supra*, comments on demeanor in response to the arguments of defense counsel are appropriate.  *See Rivera*, 971 F.2d at 885.  More importantly in this case, the prosecutor merely suggested that the lapses of memory were due to fear and loyalty:

> She didn't want her recollection refreshed ladies and gentlemen, because she wanted to help Reggie Young, her big brother, her friend for many years.  And his friend, Randy Hutchinson, who she pointed out was in the courtroom when she testified. Was that to make sure that she did the right thing, ladies and gentleman?  Was she afraid testifying up there?

Docket No. 65, Attach. 41 at 270.  This was clearly permissible argument.

### D. Suggestion that Petitioner caught a ride with Randy Hutchinson

Petitioner contends the prosecution improperly testified when she suggested that Petitioner might have gotten back to Geno's so quickly by getting a ride from Randy Hutchinson.  Defense counsel had argued that Petitioner would have needed to run seven-minute miles to get back to Geno's by 11:45p.m.  As Dale Shackleford did not recall Petitioner being sweaty, counsel suggested this was enough for reasonable doubt.  Docket No. 65, Attach. 41 at 251-53.  In response, the prosecutor suggested that perhaps Petitioner got a ride from Hutchinson, who walked into Geno's with Petitioner at 11:45p.m.  Although there was no evidence that Hutchinson had a car, this was

25

not an unreasonable inference for the prosecutor to ask the jury to draw from the totality of the evidence.  *See United States v. Salameh*, 152 F.3d 88, 138 (2d Cir. 1998) (government is given broad latitude within which to suggest reasonable inferences from the evidence).

The prosecutor clearly made some mistakes during her summation.  However, given defense counsel's argument that preceded her summation, the courts curative instructions, and the overwhelming evidence against Petitioner, the Court finds that these mistakes did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  Accordingly, the state court's decision was clearly not contrary to or an unreasonable application of federal law.

## CONCLUSION

Most of Petitioner's claims are barred for untimeliness.  Those claims that were timely fail on the merits.  Further, as reasonable jurists could not disagree that the errors alleged by Petitioner are either barred for untimeliness or fail on the merits, the Court declines to issue a Certificate of Appealability.[5]

Accordingly, **IT IS HEREBY ORDERED** that:

1. Petitioner's application for writ of habeas corpus is DENIED;

2. The Court declines to issue a Certificate of Appealability; and

3. The Clerk shall enter judgment accordingly.

Dated this the 30th day of December 2008.

/s/ James K. Singleton, Jr.
**JAMES K. SINGLETON, JR.**
United States District Judge

---

[5]A district court may grant a certificate of appealability only if a petitioner makes a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(2).  "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  *Slack v. McDaniel*, 529 U.S. 473, 482 (2000) (internal quotation marks and citations omitted).